## ZOBREST ET AL. *v.* CATALINA FOOTHILLS SCHOOL DISTRICT

No. 92–94.   Argued February 24, 1993—Decided June 18, 1993

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, SCALIA, KENNEDY, and THOMAS, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which SOUTER, J., joined, and in which STEVENS and O'CONNOR, JJ., joined as to Part I, *post*, p. 14. O'CONNOR, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 24.

*William Bentley Ball* argued the cause for petitioners. With him on the briefs was *Thomas J. Berning.*

*Acting Solicitor General Bryson* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Roberts, Ronald J. Mann, Jeffrey C. Martin,* and *Susan Craig.*

*John C. Richardson* argued the cause for respondent. With him on the brief was *Gary F. Urman.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner James Zobrest, who has been deaf since birth, asked respondent school district to provide a sign-language interpreter to accompany him to classes at a Roman Catholic high school in Tucson, Arizona, pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U. S. C. § 1400 *et seq.*, and its Arizona counterpart, Ariz. Rev. Stat. Ann. § 15–761 *et seq.* (1991 and Supp. 1992). The United States Court of Appeals for the Ninth Circuit decided, however, that provision of such a publicly employed interpreter would violate the Establishment Clause of the First Amendment. We hold that the Establishment Clause does not bar the school district from providing the requested interpreter.

---

*Briefs of *amici curiae* urging reversal were filed for the Alexander Graham Bell Association for the Deaf by *Bonnie P. Tucker;* for the American Jewish Congress et al. by *Marc D. Stern, Lois C. Waldman, Oliver S. Thomas,* and *J. Brent Walker;* for the Christian Legal Society et al. by *Michael W. McConnell, Steven T. McFarland,* and *Bradley P. Jacob;* for the Deaf Community Center, Inc., by *Jay Alan Sekulow, James M. Henderson, Sr., Mark N. Troobnick, Jordan W. Lorence, Keith A. Fournier, John G. Stepanovich, Thomas Patrick Monaghan,* and *Walter M. Weber;* for the United States Catholic Conference by *Mark E. Chopko, John A. Liekweg,* and *Phillip H. Harris;* for the Institute for Justice by *William H. Mellor III* and *Clint Bolick;* and for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin* and *Dennis Rapps.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Bradley S. Phillips, Steven R. Shapiro, John A. Powell, Steven K. Green, Steven M. Freeman,* and *Samuel Rabinove;* for the Arizona School Boards Association, Inc., by *Robert J. DuComb, Jr.;* for the Council on Religious Freedom by *Lee Boothby, Robert W. Nixon, Walter E. Carson,* and *Rolland Truman;* for the National School Boards Association by *Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon;* and for the National Committee for Public Education and Religious Liberty et al. by *David B. Isbell, T. Jeremy Gunn,* and *Elliot M. Mincberg.*

4

James Zobrest attended grades one through five in a school for the deaf, and grades six through eight in a public school operated by respondent. While he attended public school, respondent furnished him with a sign-language interpreter. For religious reasons, James' parents (also petitioners here) enrolled him for the ninth grade in Salpointe Catholic High School, a sectarian institution.[1] When petitioners requested that respondent supply James with an interpreter at Salpointe, respondent referred the matter to the county attorney, who concluded that providing an interpreter on the school's premises would violate the United States Constitution. App. 10–18. Pursuant to Ariz. Rev. Stat. Ann. § 15–253(B) (1991), the question next was referred to the Arizona attorney general, who concurred in the county attorney's opinion. App. to Pet. for Cert. A–137. Respondent accordingly declined to provide the requested interpreter.

Petitioners then instituted this action in the United States District Court for the District of Arizona under 20 U. S. C. § 1415(e)(4)(A), which grants the district courts jurisdiction over disputes regarding the services due disabled children under the IDEA.[2] Petitioners asserted that the IDEA and the Free Exercise Clause of the First Amendment require respondent to provide James with an interpreter at Salpointe, and that the Establishment Clause does not bar such relief. The complaint sought a preliminary injunction and "such other and further relief as the Court deems just and proper." App. 25.[3] The District Court denied petitioners'

---

[1] The parties have stipulated: "The two functions of secular education and advancement of religious values or beliefs are inextricably intertwined throughout the operations of Salpointe." App. 92.

[2] The parties agreed that exhaustion of administrative remedies would be futile here. *Id.*, at 94–95.

[3] During the pendency of this litigation, James completed his high school studies and graduated from Salpointe on May 16, 1992. This case nonetheless presents a continuing controversy, since petitioners seek reimbursement for the cost they incurred in hiring their own interpreter, more than $7,000 per year. *Id.*, at 65.

request for a preliminary injunction, finding that the provision of an interpreter at Salpointe would likely offend the Establishment Clause. *Id.*, at 52–53. The court thereafter granted respondent summary judgment, on the ground that "[t]he interpreter would act as a conduit for the religious inculcation of James—thereby, promoting James' religious development at government expense." App. to Pet. for Cert. A–35. "That kind of entanglement of church and state," the District Court concluded, "is not allowed." *Ibid.*

The Court of Appeals affirmed by a divided vote, 963 F. 2d 1190 (CA9 1992), applying the three-part test announced in *Lemon* v. *Kurtzman,* 403 U. S. 602, 613 (1971). It first found that the IDEA has a clear secular purpose: "'to assist States and Localities to provide for the education of all handicapped children.'" 963 F. 2d, at 1193 (quoting 20 U. S. C. § 1400(c)).[4] Turning to the second prong of the *Lemon* inquiry, though, the Court of Appeals determined that the IDEA, if applied as petitioners proposed, would have the primary effect of advancing religion and thus would run afoul of the Establishment Clause. "By placing its employee in the sectarian school," the Court of Appeals reasoned, "the government would create the appearance that it was a 'joint sponsor' of the school's activities." 963 F. 2d, at 1194–1195. This, the court held, would create the "symbolic union of government and religion" found impermissible in *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 392 (1985).[5] In contrast, the dissenting judge argued that "[g]eneral welfare programs neutrally available to all children," such as the IDEA, pass constitutional muster, "because their benefits diffuse over the entire population." 963 F. 2d, at 1199 (opinion of Tang,

---

[4] Respondent now concedes that "the IDEA has an appropriate 'secular purpose.'" Brief for Respondent 16.

[5] The Court of Appeals also rejected petitioners' Free Exercise Clause claim. 963 F. 2d, at 1196–1197. Petitioners have not challenged that part of the decision below. Pet. for Cert. 10, n. 9.

J.). We granted certiorari, 506 U. S. 813 (1992), and now reverse.

Respondent has raised in its brief in opposition to certiorari and in isolated passages in its brief on the merits several issues unrelated to the Establishment Clause question.[6] Respondent first argues that 34 CFR § 76.532(a)(1) (1992), a regulation promulgated under the IDEA, precludes it from using federal funds to provide an interpreter to James at Salpointe. Brief in Opposition 13.[7] In the alternative, respondent claims that even if there is no affirmative bar to the relief, it is not *required* by statute or regulation to furnish interpreters to students at sectarian schools. Brief for Respondent 4, n. 4.[8] And respondent adds that providing such

---

[6] Respondent may well have waived these other defenses. For in response to an interrogatory asking why it had refused to provide the requested service, respondent referred only to the putative Establishment Clause bar. App. 59–60.

[7] That regulation prohibits the use of federal funds to pay for "[r]eligious worship, instruction, or proselytization." 34 CFR § 76.532(a)(1) (1992). The United States asserts that the regulation merely implements the Secretary of Education's understanding of (and thus is coextensive with) the requirements of the Establishment Clause. Brief for United States as *Amicus Curiae* 23; see also Brief for United States as *Amicus Curiae* in *Witters* v. *Dept. of Services for Blind,* O. T. 1985, No. 84–1070, p. 21, n. 11 ("These regulations are based on the Department's interpretation of constitutional requirements"). This interpretation seems persuasive to us. The only authority cited by the Secretary for issuance of the regulation is his general rulemaking power. See 34 CFR § 76.532 (1992) (citing 20 U. S. C. §§ 1221e–3(a)(1), 2831(a), and 2974(b)). Though the Fourth Circuit placed a different interpretation on § 76.532 in *Goodall* v. *Stafford County School Board,* 930 F. 2d 363, 369 (holding that the regulation prohibits the provision of an interpreter to a student in a sectarian school), cert. denied, 502 U. S. 864 (1991), that court did not have the benefit of the United States' views.

[8] In our view, this belated contention is entitled to little, if any, weight here given respondent's repeated concession that, but for the perceived federal constitutional bar, it would have willingly provided James with an interpreter at Salpointe as a matter of local policy. See, *e. g.,* Tr. of Oral Arg. 31 ("We don't deny that . . . we would have voluntarily done

a service would offend Art. II, § 12, of the Arizona Constitution. Tr. of Oral Arg. 28.

It is a familiar principle of our jurisprudence that federal courts will not pass on the constitutionality of an Act of Congress if a construction of the Act is fairly possible by which the constitutional question can be avoided. See, *e. g., United States* v. *Locke,* 471 U. S. 84, 92 (1985), and cases cited therein. In *Locke,* a case coming here by appeal under 28 U. S. C. § 1252 (1982 ed.), we said that such an appeal "brings before this Court not merely the constitutional question decided below, but the entire case." 471 U. S., at 92. "The entire case," we explained, "includes nonconstitutional questions actually decided by the lower court as well as nonconstitutional grounds presented to, but not passed on, by the lower court." *Ibid.* Therefore, in that case, we turned "first to the nonconstitutional questions pressed below." *Ibid.*

Here, in contrast to *Locke* and other cases applying the prudential rule of avoiding constitutional questions, only First Amendment questions were pressed in the Court of Appeals. In the opening paragraph of its opinion, the Court of Appeals noted that petitioners' appeal raised only First Amendment issues:

> "The Zobrests appeal the district court's ruling that provision of a state-paid sign language interpreter to James Zobrest while he attends a sectarian high school would violate the Establishment Clause. The Zobrests also argue that denial of such assistance violates the Free Exercise Clause." 963 F. 2d, at 1191.

Respondent did not urge any statutory grounds for affirmance upon the Court of Appeals, and thus the Court of Appeals decided only the federal constitutional claims raised by petitioners. In the District Court, too, the parties chose to

that. The only concern that came up at the time was the Establishment Clause concern").

litigate the case on the federal constitutional issues alone. "Both parties' motions for summary judgment raised only federal constitutional issues." Brief for Respondent 4, n. 4. Accordingly, the District Court's order granting respondent summary judgment addressed only the Establishment Clause question. App. to Pet. for Cert. A–35.

Given this posture of the case, we think the prudential rule of avoiding constitutional questions has no application. The fact that there may be buried in the record a nonconstitutional ground for decision is not by itself enough to invoke this rule. See, *e. g., Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.,* 482 U. S. 569, 572 (1987). "Where issues are neither raised before nor considered by the Court of Appeals, this Court will not ordinarily consider them." *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 147, n. 2 (1970). We therefore turn to the merits of the constitutional claim.

We have never said that "religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Bowen* v. *Kendrick,* 487 U. S. 589, 609 (1988). For if the Establishment Clause did bar religious groups from receiving general government benefits, then "a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair." *Widmar* v. *Vincent,* 454 U. S. 263, 274–275 (1981) (internal quotation marks omitted). Given that a contrary rule would lead to such absurd results, we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit. Nowhere have we stated this principle more clearly than in *Mueller* v. *Allen,* 463 U. S. 388 (1983), and *Witters* v. *Washington Dept. of Services for Blind,* 474 U. S. 481 (1986), two cases dealing specifically

with government programs offering general educational assistance.

In *Mueller*, we rejected an Establishment Clause challenge to a Minnesota law allowing taxpayers to deduct certain educational expenses in computing their state income tax, even though the vast majority of those deductions (perhaps over 90%) went to parents whose children attended sectarian schools. See 463 U. S., at 401; *id.*, at 405 (Marshall, J., dissenting). Two factors, aside from States' traditionally broad taxing authority, informed our decision. See *Witters*, *supra*, at 491 (Powell, J., concurring) (discussing *Mueller*). We noted that the law "permits *all* parents—whether their children attend public school or private—to deduct their children's educational expenses." 463 U. S., at 398 (emphasis in original). See also *Widmar, supra*, at 274 ("The provision of benefits to so broad a spectrum of groups is an important index of secular effect"); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 248 (1990) (plurality opinion) (same). We also pointed out that under Minnesota's scheme, public funds become available to sectarian schools "only as a result of numerous private choices of individual parents of school-age children," thus distinguishing *Mueller* from our other cases involving "the direct transmission of assistance from the State to the schools themselves." 463 U. S., at 399.

*Witters* was premised on virtually identical reasoning. In that case, we upheld against an Establishment Clause challenge the State of Washington's extension of vocational assistance, as part of a general state program, to a blind person studying at a private Christian college to become a pastor, missionary, or youth director. Looking at the statute as a whole, we observed that "[a]ny aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients." 474 U. S., at 487. The program, we said, "creates no financial incentive for students

to undertake sectarian education." *Id.*, at 488. We also remarked that, much like the law in *Mueller,* "Washington's program is 'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited.'" *Witters, supra,* at 487 (quoting *Committee for Public Ed. & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 782–783, n. 38 (1973)). In light of these factors, we held that Washington's program—even as applied to a student who sought state assistance so that he could become a pastor—would not advance religion in a manner inconsistent with the Establishment Clause. *Witters, supra,* at 489.

That same reasoning applies with equal force here. The service at issue in this case is part of a general government program that distributes benefits neutrally to any child qualifying as "disabled" under the IDEA, without regard to the "sectarian-nonsectarian, or public-nonpublic nature" of the school the child attends. By according parents freedom to select a school of their choice, the statute ensures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents. In other words, because the IDEA creates no financial incentive for parents to choose a sectarian school, an interpreter's presence there cannot be attributed to state decisionmaking. Viewed against the backdrop of *Mueller* and *Witters,* then, the Court of Appeals erred in its decision. When the government offers a neutral service on the premises of a sectarian school as part of a general program that "is in no way skewed towards religion," *Witters, supra,* at 488, it follows under our prior decisions that provision of that service does not offend the Establishment Clause. See *Wolman* v. *Walter,* 433 U. S. 229, 244 (1977). Indeed, this is an even easier case than *Mueller* and *Witters* in the sense that, under the IDEA, no funds traceable to the government ever find their way into sectarian schools' coffers. The only indirect economic benefit a sectarian school might receive by dint of the IDEA is the disabled child's tuition—and that is,

of course, assuming that the school makes a profit on each student; that, without an IDEA interpreter, the child would have gone to school elsewhere; and that the school, then, would have been unable to fill that child's spot.

Respondent contends, however, that this case differs from *Mueller* and *Witters*, in that petitioners seek to have a public employee physically present in a sectarian school to assist in James' religious education. In light of this distinction, respondent argues that this case more closely resembles *Meek* v. *Pittenger*, 421 U. S. 349 (1975), and *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985). In *Meek*, we struck down a statute that, *inter alia*, provided "massive aid" to private schools—more than 75% of which were church related—through a direct loan of teaching material and equipment. 421 U. S., at 364–365. The material and equipment covered by the statute included maps, charts, and tape recorders. *Id.*, at 355. According to respondent, if the government could not place a tape recorder in a sectarian school in *Meek*, then it surely cannot place an interpreter in Salpointe. The statute in *Meek* also authorized state-paid personnel to furnish "auxiliary services"—which included remedial and accelerated instruction and guidance counseling—on the premises of religious schools. We determined that this part of the statute offended the First Amendment as well. *Id.*, at 372. *Ball* similarly involved two public programs that provided services on private school premises; there, public employees taught classes to students in private school classrooms.[9] 473 U. S., at 375. We found that those programs likewise violated the Constitution, relying largely on *Meek*. 473 U. S., at 386–389. According to respondent, if the government could not provide educational services on the premises of sectarian schools in *Meek* and *Ball*, then it surely cannot provide James with an interpreter on the premises of Salpointe.

---

[9] Forty of the forty-one private schools involved in *Ball* were pervasively sectarian. 473 U. S., at 384–385.

Respondent's reliance on *Meek* and *Ball* is misplaced for two reasons. First, the programs in *Meek* and *Ball*—through direct grants of government aid—relieved sectarian schools of costs they otherwise would have borne in educating their students. See *Witters*, 474 U. S., at 487 ("[T]he State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is 'that of a direct subsidy to the religious school' from the State") (quoting *Ball, supra*, at 394). For example, the religious schools in *Meek* received teaching material and equipment from the State, relieving them of an otherwise necessary cost of performing their educational function. 421 U. S., at 365–366. "Substantial aid to the educational function of such schools," we explained, "necessarily results in aid to the sectarian school enterprise as a whole," and therefore brings about "the direct and substantial advancement of religious activity." *Id.*, at 366. So, too, was the case in *Ball:* The programs challenged there, which provided teachers in addition to instructional equipment and material, "in effect subsidize[d] the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects." 473 U. S., at 397. "This kind of direct aid," we determined, "is indistinguishable from the provision of a direct cash subsidy to the religious school." *Id.*, at 395. The extension of aid to petitioners, however, does not amount to "an impermissible 'direct subsidy'" of Salpointe, *Witters, supra*, at 487, for Salpointe is not relieved of an expense that it otherwise would have assumed in educating its students. And, as we noted above, any attenuated financial benefit that parochial schools do ultimately receive from the IDEA is attributable to "the private choices of individual parents." *Mueller*, 463 U. S., at 400. Disabled children, not sectarian schools, are the primary beneficiaries of the IDEA; to the extent sectarian schools benefit at all from the IDEA, they are only incidental beneficiaries. Thus, the function of the IDEA is hardly " 'to provide desired financial

support for nonpublic, sectarian institutions.'" *Witters, supra,* at 488 (quoting *Nyquist, supra,* at 783).

Second, the task of a sign-language interpreter seems to us quite different from that of a teacher or guidance counselor. Notwithstanding the Court of Appeals' intimations to the contrary, see 963 F. 2d, at 1195, the Establishment Clause lays down no absolute bar to the placing of a public employee in a sectarian school.[10] Such a flat rule, smacking of antiquated notions of "taint," would indeed exalt form over substance.[11] Nothing in this record suggests that a sign-language interpreter would do more than accurately interpret whatever material is presented to the class as a whole. In fact, ethical guidelines require interpreters to "transmit everything that is said in exactly the same way it was intended." App. 73. James' parents have chosen of their own free will to place him in a pervasively sectarian environment. The sign-language interpreter they have requested will neither add to nor subtract from that environment, and hence the provision of such assistance is not barred by the Establishment Clause.

The IDEA creates a neutral government program dispensing aid not to schools but to individual handicapped children. If a handicapped child chooses to enroll in a sectarian school,

---

[10] For instance, in *Wolman* v. *Walter,* 433 U. S. 229, 242 (1977), we made clear that "the provision of health services to all schoolchildren—public and nonpublic—does not have the primary effect of aiding religion," even when those services are provided within sectarian schools. We accordingly rejected a First Amendment challenge to the State's providing diagnostic speech and hearing services on sectarian school premises. *Id.,* at 244; see also *Meek* v. *Pittenger,* 421 U. S. 349, 371, n. 21 (1975).

[11] Indeed, respondent readily admits, as it must, that there would be no problem under the Establishment Clause if the IDEA funds instead went directly to James' parents, who, in turn, hired the interpreter themselves. Brief for Respondent 11 ("If such were the case, then the sign language interpreter would be the student's employee, not the School District's, and governmental involvement in the enterprise would end with the disbursement of funds").

we hold that the Establishment Clause does not prevent the school district from furnishing him with a sign-language interpreter there in order to facilitate his education. The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE SOUTER joins, and with whom JUSTICE STEVENS and JUSTICE O'CONNOR join as to Part I, dissenting.

Today, the Court unnecessarily addresses an important constitutional issue, disregarding longstanding principles of constitutional adjudication. In so doing, the Court holds that placement in a parochial school classroom of a public employee whose duty consists of relaying religious messages does not violate the Establishment Clause of the First Amendment. I disagree both with the Court's decision to reach this question and with its disposition on the merits. I therefore dissent.

## I

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101, 105 (1944). See *Brockett* v. *Spokane Arcades, Inc.,* 472 U. S. 491, 501 (1985); *Ashwander* v. *TVA,* 297 U. S. 288, 347 (1936) (Brandeis, J., concurring); *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39 (1885). This is a "fundamental rule of judicial restraint," *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.,* 467 U. S. 138, 157 (1984), which has received the sanction of time and experience. It has been described as a "corollary" to the Article III case or controversy requirement, see *Rescue Army* v. *Municipal Court of Los Angeles,* 331 U. S. 549, 570 (1947), and is grounded in basic

principles regarding the institution of judicial review and this Court's proper role in our federal system, *ibid.*

Respondent School District makes two arguments that could provide grounds for affirmance, rendering consideration of the constitutional question unnecessary. First, respondent maintains that the Individuals with Disabilities Education Act (IDEA), 20 U. S. C. § 1400 *et seq.*, does not require it to furnish James Zobrest with an interpreter at any private school so long as special education services are made available at a public school. The United States endorses this interpretation of the statute, explaining that "the IDEA itself does not establish an individual entitlement to services for students placed in private schools at their parents' option." Brief for United States as *Amicus Curiae* 13. And several courts have reached the same conclusion. See, *e. g., Goodall* v. *Stafford County School Bd.,* 930 F. 2d 363 (CA4), cert. denied, 502 U. S. 864 (1991); *McNair* v. *Cardimone,* 676 F. Supp. 1361 (SD Ohio 1987), aff'd *sub nom. Mc-Nair* v. *Oak Hills Local School Dist.,* 872 F. 2d 153 (CA6 1989); *Work* v. *McKenzie,* 661 F. Supp. 225 (DC 1987). Second, respondent contends that 34 CFR § 76.532(a)(1) (1992), a regulation promulgated under the IDEA, which forbids the use of federal funds to pay for "[r]eligious worship, instruction, or proselytization," prohibits provision of a sign-language interpreter at a sectarian school. The United States asserts that this regulation does not preclude the relief petitioners seek, Brief for United States as *Amicus Curiae* 23, but at least one federal court has concluded otherwise. See *Goodall, supra.* This Court could easily refrain from deciding the constitutional claim by vacating and remanding the case for consideration of the statutory and regulatory issues. Indeed, the majority's decision does not eliminate the need to resolve these remaining questions. For, regardless of the Court's views on the Establishment Clause, petitioners will not obtain what they seek if the federal stat-

ute does not require or the federal regulations prohibit provision of a sign-language interpreter in a sectarian school.[1]

The majority does not deny the existence of these alternative grounds, nor does it dispute the venerable principle that constitutional questions should be avoided when there are nonconstitutional grounds for a decision in the case. Instead, in its zeal to address the constitutional question, the majority casts aside this "time-honored canon of constitutional adjudication," *Spector Motor Service,* 323 U. S., at 105, with the cursory observation that "the prudential rule of avoiding constitutional questions has no application" in light of the "posture" of this case, *ante,* at 8. Because the parties chose not to litigate the federal statutory issues in the District Court and in the Court of Appeals, the majority blithely proceeds to the merits of their constitutional claim.

But the majority's statements are a non sequitur. From the rule against deciding issues not raised or considered below, it does not follow that the Court should consider constitutional issues needlessly. The obligation to avoid unnecessary adjudication of constitutional questions does not depend upon the parties' litigation strategy, but rather is a "self-imposed limitation on the exercise of this Court's jurisdiction [that] has an importance to the institution that transcends the significance of particular controversies." *City of Mesquite* v. *Aladdin's Castle, Inc.,* 455 U. S. 283, 294 (1982). It is a rule whose aim is to protect not parties but the law and the adjudicatory process. Indeed, just a few days ago, we expressed concern that "litigants, by agreeing on the legal issue presented, [could] extract the opinion of a court

---

[1] Respondent also argues that public provision of a sign-language interpreter would violate the Arizona Constitution. Article II, § 12, of the Arizona Constitution provides: "No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment." The Arizona attorney general concluded that, under this provision, interpreter services could not be furnished to James. See App. 9.

on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory." *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 447 (1993). See *United States* v. *CIO,* 335 U. S. 106, 126 (1948) (Frankfurter, J., concurring).

That the federal statutory and regulatory issues have not been properly briefed or argued does not justify the Court's decision to reach the constitutional claim. The very posture of this case should have alerted the courts that the parties were seeking what amounts to an advisory opinion. After the Arizona attorney general concluded that provision of a sign-language interpreter would violate the Federal and State Constitutions, the parties bypassed the federal statutes and regulations and proceeded directly to litigate the constitutional issue. Under such circumstances, the weighty nonconstitutional questions that were left unresolved are hardly to be described as "buried in the record." *Ante,* at 8. When federal- and state-law questions similarly remained open in *Wheeler* v. *Barrera,* 417 U. S. 402 (1974), this Court refused to pass upon the scope or constitutionality of a federal statute that might have required publicly employed teachers to provide remedial instruction on the premises of sectarian schools. Prudence counsels that the Court follow a similar practice here by vacating and remanding this case for consideration of the nonconstitutional questions, rather than proceeding directly to the merits of the constitutional claim. See *Youakim* v. *Miller,* 425 U. S. 231 (1976) (vacating and remanding for consideration of statutory issues not presented to or considered by lower court); *Escambia County* v. *McMillan,* 466 U. S. 48, 51–52 (1984) (vacating and remanding for lower court to consider statutory issue parties had not briefed and Court of Appeals had not passed upon); *Edward J. DeBartolo Corp.* v. *NLRB,* 463 U. S. 147, 157–158 (1983) (vacating and remanding for consideration of statutory question).

## II

Despite my disagreement with the majority's decision to reach the constitutional question, its arguments on the merits deserve a response. Until now, the Court never has authorized a public employee to participate directly in religious indoctrination. Yet that is the consequence of today's decision.

Let us be clear about exactly what is going on here. The parties have stipulated to the following facts. James Zobrest requested the State to supply him with a sign-language interpreter at Salpointe High School, a private Roman Catholic school operated by the Carmelite Order of the Catholic Church. App. 90. Salpointe is a "pervasively religious" institution where "[t]he two functions of secular education and advancement of religious values or beliefs are inextricably intertwined." *Id.*, at 92. Salpointe's overriding "objective" is to "instill a sense of Christian values." *Id.*, at 90. Its "distinguishing purpose" is "the inculcation in its students of the faith and morals of the Roman Catholic Church." Religion is a required subject at Salpointe, and Catholic students are "strongly encouraged" to attend daily Mass each morning. *Ibid.* Salpointe's teachers must sign a Faculty Employment Agreement which requires them to promote the relationship among the religious, the academic, and the extracurricular.[2] They are encouraged to do so by "assist[ing] students in experiencing how the presence of God is manifest in nature, human history, in the struggles for economic and political justice, and other secular areas of the curriculum." *Id.*, at 92. The agreement also sets forth detailed rules of

---

[2] The Faculty Employment Agreement provides: " 'Religious programs are of primary importance in Catholic educational institutions. They are not separate from the academic and extracurricular programs, but are instead interwoven with them and each is believed to promote the other.' " App. 90–91.

conduct teachers must follow in order to advance the school's Christian mission.[3]

At Salpointe, where the secular and the sectarian are "inextricably intertwined," governmental assistance to the educational function of the school necessarily entails governmental participation in the school's inculcation of religion. A state-employed sign-language interpreter would be required to communicate the material covered in religion class, the nominally secular subjects that are taught from a religious perspective, and the daily Masses at which Salpointe encourages attendance for Catholic students. In an environment so pervaded by discussions of the divine, the interpreter's every gesture would be infused with religious significance. Indeed, petitioners willingly concede this point: "That the interpreter conveys religious messages is a given in the case." Brief for Petitioners 22. By this concession, petitioners would seem to surrender their constitutional claim.

The majority attempts to elude the impact of the record by offering three reasons why this sort of aid to petitioners survives Establishment Clause scrutiny. First, the majority observes that provision of a sign-language interpreter

---

[3] The Faculty Employment Agreement sets forth the following detailed rules of conduct:

"'1. Teacher shall at all times present a Christian image to the students by promoting and living the school philosophy stated herein, in the School's Faculty Handbook, the School Catalog and other published statements of this School. In this role the teacher shall support all aspects of the School from its religious programs to its academic and social functions. It is through these areas that a teacher administers to mind, body and spirit of the young men and women who attend Salpointe Catholic High School.

.        .        .        .        .

"'3. The School believes that faithful adherence to its philosophical principles by its teachers is essential to the School's mission and purpose. Teachers will therefore be expected to assist in the implementation of the philosophical policies of the School, and to compel proper conduct on the part of the students in the areas of general behavior, language, dress and attitude toward the Christian ideal.'" *Id.*, at 91.

occurs as "part of a general government program that distributes benefits neutrally to any child qualifying as 'disabled' under the IDEA, without regard to the 'sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends." *Ante*, at 10. Second, the majority finds significant the fact that aid is provided to pupils and their parents, rather than directly to sectarian schools. As a result, "'[a]ny aid . . . that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients.'" *Ante*, at 9, quoting *Witters* v. *Washington Dept. of Services for Blind*, 474 U. S. 481, 487 (1986). And, finally, the majority opines that "the task of a sign-language interpreter seems to us quite different from that of a teacher or guidance counselor." *Ante*, at 13.

But the majority's arguments are unavailing. As to the first two, even a general welfare program may have specific applications that are constitutionally forbidden under the Establishment Clause. See *Bowen* v. *Kendrick*, 487 U. S. 589 (1988) (holding that Adolescent Family Life Act on its face did not violate the Establishment Clause, but remanding for examination of the constitutionality of particular applications). For example, a general program granting remedial assistance to disadvantaged schoolchildren attending public and private, secular and sectarian schools alike would clearly offend the Establishment Clause insofar as it authorized the provision of teachers. See *Aguilar* v. *Felton*, 473 U. S. 402, 410 (1985); *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 385 (1985); *Meek* v. *Pittenger*, 421 U. S. 349, 371 (1975). Such a program would not be saved simply because it supplied teachers to secular as well as sectarian schools. Nor would the fact that teachers were furnished to pupils and their parents, rather than directly to sectarian schools, immunize such a program from Establishment Clause scrutiny. See *Witters*, 474 U. S., at 487 ("Aid may have [unconstitutional] effect even though it takes the form of aid to students

or parents"); *Wolman* v. *Walter,* 433 U. S. 229, 250 (1977) (it would "exalt form over substance if this distinction [between equipment loaned to the pupil or his parent and equipment loaned directly to the school] were found to justify a . . . different" result); *Ball,* 473 U. S., at 395 (rejecting "fiction that a . . . program could be saved by masking it as aid to individual students"). The majority's decision must turn, then, upon the distinction between a teacher and a sign-language interpreter.

"Although Establishment Clause jurisprudence is characterized by few absolutes," at a minimum "the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith." *Id.,* at 385. See *Bowen* v. *Kendrick,* 487 U. S., at 623 (O'CONNOR, J., concurring) ("*[A]ny* use of public funds to promote religious doctrines violates the Establishment Clause") (emphasis in original); *Meek,* 421 U. S., at 371 ("'The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion,'" quoting *Lemon* v. *Kurtzman,* 403 U. S. 602, 619 (1971)); *Levitt* v. *Committee for Public Ed. & Religious Liberty,* 413 U. S. 472, 480 (1973) ("[T]he State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination"). In keeping with this restriction, our cases consistently have rejected the provision by government of any resource capable of advancing a school's religious mission. Although the Court generally has permitted the provision of "secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school," *Meek,* 421 U. S., at 364, it has always proscribed the provision of benefits that afford even the "opportunity for the transmission of sectarian views," *Wolman,* 433 U. S., at 244.

Thus, the Court has upheld the use of public school buses to transport children to and from school, *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1 (1947), while striking down the

employment of publicly funded buses for field trips controlled by parochial school teachers, *Wolman*, 433 U. S., at 254. Similarly, the Court has permitted the provision of secular textbooks whose content is immutable and can be ascertained in advance, *Board of Ed. of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236 (1968), while prohibiting the provision of any instructional materials or equipment that could be used to convey a religious message, such as slide projectors, tape recorders, record players, and the like, *Wolman*, 433 U. S., at 249. State-paid speech and hearing therapists have been allowed to administer diagnostic testing on the premises of parochial schools, *id.*, at 241–242, whereas state-paid remedial teachers and counselors have not been authorized to offer their services because of the risk that they may inculcate religious beliefs, *Meek*, 421 U. S., at 371.

These distinctions perhaps are somewhat fine, but " 'lines must be drawn.' " *Ball*, 473 U. S., at 398 (citation omitted). And our cases make clear that government crosses the boundary when it furnishes the medium for communication of a religious message. If petitioners receive the relief they seek, it is beyond question that a state-employed sign-language interpreter would serve as the conduit for James' religious education, thereby assisting Salpointe in its mission of religious indoctrination. But the Establishment Clause is violated when a sectarian school enlists "the machinery of the State to enforce a religious orthodoxy." *Lee* v. *Weisman*, 505 U. S. 577, 592 (1992).

*Witters*, *supra*, and *Mueller* v. *Allen*, 463 U. S. 388 (1983), are not to the contrary. Those cases dealt with the payment of cash or a tax deduction, where governmental involvement ended with the disbursement of funds or lessening of tax. This case, on the other hand, involves ongoing, daily, and intimate governmental participation in the teaching and propagation of religious doctrine. When government dispenses public funds to individuals who employ them to finance private choices, it is difficult to argue that government

is actually endorsing religion. But the graphic symbol of the concert of church and state that results when a public employee or instrumentality mouths a religious message is likely to "enlis[t]—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the school." *Ball*, 473 U. S., at 385. And the union of church and state in pursuit of a common enterprise is likely to place the *imprimatur* of governmental approval upon the favored religion, conveying a message of exclusion to all those who do not adhere to its tenets.

Moreover, this distinction between the provision of funds and the provision of a human being is not merely one of form. It goes to the heart of the principles animating the Establishment Clause. As *amicus* Council on Religious Freedom points out, the provision of a state-paid sign-language interpreter may pose serious problems for the church as well as for the state. Many sectarian schools impose religiously based rules of conduct, as Salpointe has in this case. A traditional Hindu school would be likely to instruct its students and staff to dress modestly, avoiding any display of their bodies. And an orthodox Jewish yeshiva might well forbid all but kosher food upon its premises. To require public employees to obey such rules would impermissibly threaten individual liberty, but to fail to do so might endanger religious autonomy. For such reasons, it long has been feared that "a union of government and religion tends to destroy government and to degrade religion." *Engel* v. *Vitale*, 370 U. S. 421, 431 (1962). The Establishment Clause was designed to avert exactly this sort of conflict.

## III

The Establishment Clause "rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *Illinois ex rel. McCollum* v. *Board of Ed. of*

School Dist. No. 71, Champaign Cty., 333 U. S. 203, 212 (1948). To this end, our cases have strived to "chart a course that preserve[s] the autonomy and freedom of religious bodies while avoiding any semblance of established religion." *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 672 (1970). I would not stray, as the Court does today, from the course set by nearly five decades of Establishment Clause jurisprudence. Accordingly, I dissent.

JUSTICE O'CONNOR, with whom JUSTICE STEVENS joins, dissenting.

I join Part I of JUSTICE BLACKMUN's dissent. In my view, the Court should vacate and remand this case for consideration of the various threshold problems, statutory and regulatory, that may moot the constitutional question urged upon us by the parties. "It is a fundamental rule of judicial restraint . . . that this Court will not reach constitutional questions in advance of the necessity of deciding them." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 157 (1984). That "fundamental rule" suffices to dispose of the case before us, whatever the proper answer to the decidedly hypothetical issue addressed by the Court. I therefore refrain from addressing it myself. See *Rust* v. *Sullivan*, 500 U. S. 173, 223–225 (1991) (O'CONNOR, J., dissenting).