**FREEDOM FROM RELIGION FOUNDATION, INC., Anne Gaylor, Annie Laurie Gaylor and Dan Barker, Plaintiffs,**

v.

**Mark D. BUGHER, John T. Benson, Raymond Allen, Gus W. Wirth, Jr., L. Anne Reid, Jonathan Barry, James M. Bowen, Rodey G. Pasch and Darylann Whitemarsh, Defendants.**

No. 98–C–767–S.

United States District Court, W.D. Wisconsin.

June 23, 1999.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 challenging the constitutionality of a Wisconsin program which subsidizes telecommunications access for public and private schools. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343. The matter is presently before the Court on cross motions for summary judgment. The following facts are undisputed for purposes of this motion.

## FACTS

The 1997–99 Wisconsin budget Act created the Technology for Education Achievement in Wisconsin board ("the TEACH board") and the Educational Telecommunications Access Program ("the Program") to be administered by the TEACH board. Defendants are members of the TEACH board. Under the terms of the Program school districts, private schools, cooperative educational service organizations (CESAs), technical colleges, private colleges and public library boards may request that the TEACH board provide them with access to one data line or video link. Wis. Stats. § 196.218(4r). Data lines and video links enable the user to access the internet. Video links also enable the user to create an interactive television hook-up whereby students and a teacher can see, hear and speak to each other via television from remote locations.

The Program makes no effort to control the content of information received by participants over data or video links and such links are sometimes used to transmit religious information.

Under the terms of the Program participants are charged $100 per month for a data link and $250 per month for a video link. The cost to the Program to provide data links and video links is approximately $640 and $2300 per month, respectively. The TEACH board's administrative costs are funded with general tax revenues. The cost of the Program is funded by mandatory contributions from telecommunications providers who are permitted to increase their rates to other customers to recover the costs. In addition to public recipients the program provides data links to twelve private sectarian elementary schools, ten private sectarian high schools and nine private colleges, most of which have a religious affiliation. The Program provides video links to five private sectarian high schools and eight private colleges, some of which are religiously affiliated.

The Program currently spends $203,962 per month for its share of the data line costs for 367 participating schools, colleges, libraries and CESAs. A total of 33 private schools and colleges participate at a total monthly cost to the Program of $21,952. The Program currently spends $358,996 for its share of video link costs for 102 participating schools, colleges and CESAs. A total of fourteen private schools and colleges participate at a total monthly cost to the Program of $25,345.

The Program was amended in 1997 to provide grants to school districts and private schools which had in effect on October 14, 1997, a contract for access to a data line or video link. The grant amount is the difference between the cost to the Program to supply a link less the ordinary contribution of the school, but not to exceed the actual contract cost. Wis. Stats. § 196.218(4r)(g). No statutory restriction is placed on the use of the grant funds,

although a letter accompanying the grant provides that the funds are to be used for "educational technology purposes ... includ[ing] making payments on the existing service contract, purchasing hardware and software, providing training to teachers and staff, upgrading existing networks, wiring school buildings, or completing any other educational technology project."

The Program has awarded $1,944,261 in grants to 120 schools and colleges. Of those grants, $58,873 have gone to private religiously affiliated schools and colleges.

## MEMORANDUM

Plaintiffs argue that providing subsidized telecommunications services and cash grants to religious schools constitutes impermissible direct aid to religious institutions in violation of the Establishment Clause. Defendants assert that the Program is non-discriminatory, does not have the primary effect of advancing religion and is therefore permissible under Establishment Clause jurisprudence. All parties assert entitlement to summary judgment. The only disputed issues of fact concern whether particular religious schools are "pervasively sectarian."

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure. A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because the Court finds that the claims can be resolved as a matter of law

without determining whether specific participating religious schools are "pervasively sectarian," the matter is appropriately resolved on summary judgment.

■ The Supreme Court has consistently acknowledged that the boundaries of the Establishment Clause are not well defined: "we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Witters v. Washington Dept. of Services for the Blind,* 474 U.S. 481, 485, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (*quoting Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). The basic framework for analyzing the constitutionality of state aid under the Establishment Clause is the three part *Lemon* test which provides that a statute is constitutional if it has a secular legislative purpose, has a principal or primary effect that neither advances nor inhibits religion and does not foster an excessive government entanglement with religion. *Wolman v. Walter,* 433 U.S. 229, 236, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977).

■ The *Lemon* test, however, serves only as a guideline for identifying the degree to which the objectives of the Establishment Clause may be impaired by a state statute. *Meek v. Pittenger,* 421 U.S. 349, 359, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). The primary objective of the Establishment Clause is to avoid sponsorship, financial support and active involvement of the government in religious activities. *Id.* Religious institutions may sometimes constitutionally participate in public social welfare programs that neutrally provide benefits to a broad class of citizens defined without reference to religion. *Zobrest v. Catalina Foothills School Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). The ultimate question is one of degree: whether the benefit to a religious entity from a government program is of a type or magnitude that impermissibly advances religion. *Meek,* 421 U.S. at 359, 95 S.Ct. 1753.

The Program provides two distinct types of benefits—subsidized telecommunications access and technology grants for those who have previously contracted for access with third parties. The two benefits require separate analysis.

*Subsidized Telecommunications Access*

■ The obvious secular purpose of the Wisconsin Legislature in enacting the Program was to make internet and interactive video links available to all Wisconsin students as a means of enhancing their educational opportunity. Especially since only a minor portion of the Program funds benefit religious schools, there is no available inference that the legislative purpose was to advance religion, and plaintiffs do not contend that there was a non-secular legislative motive.

■ The critical *Lemon* test prong in this case is whether the program has a principal or primary effect that neither advances nor inhibits religion. For the following reasons, this Court concludes that the provision of subsidized telecommunications links also satisfies the second prong. First, the identification of entities to receive subsidized hook-ups is entirely unaffected by a schools religious affiliation or lack thereof. Any school, public or private, religious or secular, is eligible to participate. Such a broad non-discriminatory distribution of program benefits is typical of a program which does not offend the Establishment Clause. *Zobrest*, 509 U.S. at 8, 113 S.Ct. 2462. *See Also, Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 782 n. 38, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (collecting cases which approved programs on the basis of availability to both public and private institutions).

Second, the telecommunications services provided are themselves a mere conduit and are entirely neutral as to the content of the information transmitted through them. Like the interpreter in *Zobrest*, internet or video connections are susceptible to use for transmitting religious or secular information, but by themselves do not affect the content or in anyway endorse or advance religion. 509 U.S. at 13, 113 S.Ct. 2462.

Third, the total benefits flowing to religious schools under the program is fairly small both as a percentage of total expenditures relative to non-religious beneficiaries and in absolute terms. The cost to the Program of data and video links used by all private schools is $47,297 per month, about 8.4% of total costs for that aspect of the program. This is in marked contrast to the cases which plaintiffs assert as controlling, *Meek*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217, and *Wolman*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714. The relevant statute in *Wolman* appropriated $88 million dollars over a two year budget period for the benefit of nonpublic school students, 96% of whom attended religious schools and 92% of whom attended Catholic schools. 433 U.S. at 233–34, 97 S.Ct. 2593. Similarly, the equipment and instructional materials provided to students in *Meek* in a single year were worth $12 million and were provided almost entirely to church related non-public schools. 421 U.S. at 365, 95 S.Ct. 1753. It is apparent from reading the decisions that the magnitude of the aid and its direction almost entirely to religious schools was a critical factor in determining that components of the programs impermissibly advanced religious interests.

Fourth, the Program does not provide a direct subsidy because participating schools receive no cash payments and, by the very nature of the program, do not receive a service which they were previously providing at their own expense. As a result the program creates no financial incentive for a student to choose a religious school over a non-religious school. It is a common theme in Supreme Court Establishment Clause precedent that payments to religious institutions, whether in cash or kind, are not permissible when they amount to direct subsidies but are permissible when they benefit students in

a way that only indirectly benefits the school. *Witters,* 474 U.S. at 487, 106 S.Ct. 748. The question, however, is not as simple as whether funds are paid to schools, students or parents but depends upon the real effect of the subsidy. *Id.* The Court explained in *Zobrest:*

> For example, the religious schools in *Meek* received teaching material and equipment from the State, relieving them of an otherwise necessary cost of performing their educational function. 421 U.S. at 365–66, 95 S.Ct. 1753. "Substantial aid to the educational function of such schools," we explained, "necessarily results in aid to the sectarian school enterprise as a whole," and therefore brings about "the direct and substantial advancement of religious activity." ...The extension of aid to petitioners, however, does not amount to "an impermissible 'direct subsidy'" of [the Catholic school], for [it] is not relieved of an expense that it otherwise would have assumed in educating the students.

509 U.S. at 12, 113 S.Ct. 2462.

Viewed in light of the Court's analysis of the distinction between direct and indirect benefits it is clear that the subsidized telecommunications links are constitutionally permissible. "[N]o funds traceable to the government ever find their way into sectarian school's coffers." *Id.* at 10, 113 S.Ct. 2462. In fact, cash flows from the schools to the state. The schools receiving subsidized links were not previously providing the service and therefore were not relieved of a necessary cost they would incur without the Program. Accordingly, this case is readily distinguishable from the in kind subsidies in *Meek* and *Wolman* of materials and equipment which the schools would otherwise be required to buy. Sectarian schools cannot convert subsidized telecommunications links into an economic benefit to be used for the advancement of the institution as a whole and its religious mission. The schools were not previously spending their own money on such links, and no resources

have been freed up by the Program to advance the religious purpose of the school. Furthermore, given the broad availability of the Program to both public and private schools there is also little likelihood that the Program will affect the ability of religious schools to recruit students.

The fact that the relevant transaction takes place directly between the schools and the state is not constitutionally fatal to the Program. The law concerns itself with the realities of the effect upon the school, not with the form of the transaction. In a case like *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), where the effect of a program is the equivalent of cash aid flowing to sectarian schools, the intervention between the state and the school of independent parent decision makers is important to finding that the benefit to the school is indirect and the primary effect of the statute is not the advancement of religion. *Id.* at 399, 103 S.Ct. 3062. Where, as here, a benefit not essential to the operation of the school goes directly to the students in kind regardless of their choice to attend a secular or sectarian school, the school's delivery of the benefit does not render the program unconstitutional. *See Agostini v. Felton,* 521 U.S. 203, 228–30, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

Finally, there is no risk of excessive entanglement as a result of the subsidized links either in a direct or political sense. The Program requires no monitoring of schools by the state and does not require significant administrative cooperation between parochial schools and the state. *Id.* at 233, 117 S.Ct. 1997. Nor is the level of aid so significant that there is the risk of political divisiveness on religious grounds. *Id.*

Accordingly, the Program's provision of subsidized links to all schools on a neutral basis satisfies each prong of the *Lemon* test and is not in violation of the Establishment Clause. The real purpose and effect of the Program is to provide a direct bene-

fit to students without regard to religious affiliation. Any benefit to religious schools is indirect and insubstantial.

*Direct Grants*

█ It is apparent from the analysis above that the direct grant portion of the Program is fundamentally different from the provision of subsidized telecommunications links because it provides cash payments directly to religious schools which can be employed to further religious purposes. As a result, the grant portion of the program has as a primary effect the advancement of religion, fails the second element of the test, and is unconstitutional as applied to religious schools, whether pervasively sectarian or not.

The grant program has an apparently secular legislative motive. Having conferred a benefit on schools without telecommunications links through the subsidized links, the legislature sought to benefit equally those schools who had independently determined that such links were a necessary part of their education program and had already contracted for the services with third party providers at full price. This is a permissible secular legislative motive for the program.

The effect of the program, however, is clearly not constitutionally permissible. However dimly the lines of demarcation of the Establishment Clause are drawn this much is clear: States may not make unrestricted cash payments directly to religious institutions, pervasively sectarian or not. *Tilton v. Richardson,* 403 U.S. 672, 683, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). It well settled that "the State may not grant aid to a religious school ... where the direct effect of the aid is that of a 'direct subsidy to the religious school' from the State." *Witters,* 474 U.S. at 487. Yet this is precisely the effect of the grant provision. A religious school which has contracted for telecommunications services in order to further its own objectives and without prior promise of reimbursement is entitled to receive an unrestricted cash payment from the state. Under any reasonable view of

this aspect of the program Wisconsin impermissibly provides a direct subsidy to participating religious schools.

The effect is not altered by the letter from the TEACH board which accompanies the grant and purports to limit the uses to which it can be put. First, there is no authority in the statute for such a limitation nor any penalty for failure to comply with it. See Wis. Stat § 196.218(4r)(g). As a result the letter is little more than a recommendation. Second, there is no evidence of any ability or attempt to monitor the use of grant proceeds received by religious schools. Third, even if the letter was an enforceable limitation on the use of the grant the permitted uses are so broad that the school could spend the money on religious materials and not run afoul of the limitations. A school could, for example, purchase religious computer software with its grant and still fall within the letter's restrictions.

The grant program, as applied to religious schools, is a most obvious form of direct subsidy which is prohibited by the Establishment Clause. It provides a direct subsidy to religious schools which can readily be employed for the advancement of religious purposes.

## ORDER

IT IS ORDERED that Plaintiffs' motion for summary judgment is GRANTED as it concerns the grant aspect of the Educational Telecommunications Access Program (§ 196.218(4r)(g), Wis. Stat.) as applied to schools with religious affiliation and is in all other respects DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment is DENIED as it concerns the grant aspect of the Educational Telecommunications Access Program (§ 196.218(4r)(g), Wis. Stat.) as applied to schools with a religious affiliation and is in all other respects GRANTED.

IT IS FURTHER ORDERED that judgment be entered declaring the grant aspect of the Wisconsin Educational Telecommunications Access Program (§ 196.218(4r)(g), Wis. Stat.) unconstitutional as applied to schools with a religious affiliation and dismissing all other claims with prejudice.