Chief Judge Kaye
(concurring). Applying the three-pronged Lemon v Kurtzman (403 US 602) test, the Court concludes that creation of the Kiryas Joel Village School District violates the Establishment Clause. While I agree that chapter 748 of the Laws of 1989 breaches Lemon’s second prong, and thus join the Court’s opinion, I do not believe that Lemon supplies the preferred analytical framework for this case. Rather, in my view, legislation that singles out a particular religious group for special benefits or burdens should be evaluated under a strict scrutiny test, requiring that the law be closely fitted to a compelling State interest.
The law at issue is precisely the sort of legislation that should be strictly scrutinized, because it provides a particular religious sect with an extraordinary benefit: its own public school system. Although I am willing to assume that the law is addressed to a compelling governmental interest — providing special education and related services to disabled children who would otherwise go without such assistance — the law is not closely fitted to that purpose, as more moderate measures were available to satisfy that purpose. Accordingly, irrespective of the Lemon test,[1] I believe the law violates the Establishment Clause.
I.
My analysis begins with recognition that, factually, this case is unlike prior Supreme Court cases involving the relationship between religion and education. Prior cases generally fall into two broad categories: public aid to parochial schools *533 or students,[2] and religious activities within public schools[3] (see, Committee for Pub. Educ. v Nyquist, 413 US 756, 772 [identifying categories]). This case falls into neither category: the law does not provide aid to a parochial school, and it does not prescribe religious practices for a public school.
This case also differs from previous Establishment Clause education cases in a more fundamental respect. Chapter 748 is not one of the myriad "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion” (Zobrest v Catalina Foothills School Dist., 509 US —, —, 61 USLW 4641, 4643). Rather, the legislation was specifically designed to benefit Satmar Hasidim, who refuse to send their disabled children to integrated MonroeWoodbury public schools. That the law is not part of a neutral, generally applicable program of State aid but instead was intended to benefit one religious group distinguishes this case, and calls for a different analysis.
*534 The Religion Clauses of the First Amendment protect fundamental liberties and therefore apply to the States through Fourteenth Amendment’s Due Process Clause (Cantwell v Connecticut, 310 US 296, 303). Although the Equal Protection Clause of the Fourteenth Amendment has been a bulwark against arbitrary government distinctions based on race (Loving v Virginia, 388 US 1, 11), gender (Craig v Boren, 429 US 190, 197-199), national origin (Hernandez v Texas, 347 US 475, 479), alienage (Graham v Richardson, 403 US 365, 371-372) and illegitimacy (Trimble v Gordon, 430 US 762, 766), it has not been necessary to identify religion as a suspect classification for equal protection purposes; classifications along religious lines are strictly scrutinized in any event. "Just as we subject to the most exacting scrutiny laws that make classifications based on race, * * * or on the content of speech, * * * so too we strictly scrutinize governmental classifications based on religion” (Employment Div., Ore. Dept. of Human Resources v Smith, 494 US 872, 886, n 3 [citations omitted]; see, 3 Rotunda and Nowak, Constitutional Law: Substance and Procedure § 18.40, at 491-494 [2d ed 1992]).
"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.” (Larson v Valente, 456 US 228, 244.) It is thus axiomatic that the government must "maintain a course of neutrality among religions” (Grand Rapids School Dist. v Ball, 473 US 373, 382; see also, Epperson v Arkansas, 393 US 97, 104 ["The First Amendment mandates governmental neutrality between religion and religion”]; Zorach v Clauson, 343 US 306, 314 ["government must be neutral when it comes to competition between sects”]).
The State is in greatest danger of straying from its required course of neutrality when it selects a particular religious sect for special privileges or burdens. " 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders’ ” (Church of Lukumi Babalu Aye v Hialeah, 508 US —, —, 113 S Ct 2217, 2227, quoting Walz v Tax Commn., 397 US 664, 696 [Harlan, J., concurring]). Laws intentionally designed to hamper a group’s religious practices violate the Free Exercise Clause unless they are narrowly tailored to a compelling government interest (see, Church of Lukumi Babalu Aye, 508 US, at —, 113 S Ct, at 2233). By the same token, a law affording a benefit to one religious group violates the Estab *535 lishment Clause if it too is not narrowly tailored to a compelling government interest.[4]
Larson v Valente (456 US 228) is a recent application of strict scrutiny to strike down a law under the Establishment Clause. In that case, a Minnesota statute imposed certain reporting requirements on charities but exempted religious organizations receiving more than half their contributions from members. The Court concluded that the Lemon test is intended "to apply to laws affording a uniform benefit to all religions” (456 US, at 252; see also, Corporation of Presiding Bishop v Amos, 483 US 327, 339), but that when a law expresses "a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality.” (456 US, at 246; see also, Smith, 494 US, at 886, n 3; Allegheny County v Greater Pittsburgh ACLU, 492 US 573, 608-609; Lynch v Donnelly, 465 US 668, 687, n 13.)
The Larson Court determined that the distinction between religious groups was a legislatively-sanctioned denominational preference, and thus the law was invalid unless it was justified by a "compelling governmental interest” and was "closely fitted to further that interest” (456 US, at 247). The Court assumed that the statute was addressed to a compelling governmental interest — protecting citizens against abusive solicitation practices — but concluded that it was not "closely fitted” to that interest and therefore violated the Establishment Clause (456 US, at 248-251).
Larson is of course distinguishable from the present case in that the Minnesota statute discriminated among religions while here the law is aimed simply at one religion. In my view, however, that distinction does not necessarily alter the analysis. A forbidden denominational preference can result from a grant of benefits to one religious group as readily as discrimination among sects. In either case, the specter of official favoritism looms large, and the legislation should be carefully scrutinized.
*536 II.
The creation of the carved-out school district is precisely the type of legislation that should be subjected to strict scrutiny. Although the law does not, on its face, make reference to the Satmar Hasidic sect, "[fjacial neutrality is not determinative” (Church of Lukumi Babalu Aye v Hialeah, 508 US, at —, 113 S Ct, at 2227). No one disputes that purpose of the law was to create a new school district to provide disabled children of the Satmar faith with special education services in a segregated environment. Accordingly, in these circumstances the coterminality of the school district and the Village is of no moment (see, dissenting opn, at 549): the law was "an effort to resolve a longstanding conflict between the Monroe-Woodbury School District and the village of Kiryas Joel, whose population are all members of the same religious sect. ” (Governor’s Mem, 1989 McKinney’s Session Laws of NY, at 2429 [emphasis added].) Without doubt, the law was designed to confer a benefit on a particular religious group.
Plainly this special interest legislation cannot be equated with the statutory scheme in Zobrest v Catalina Foothills School Dist. (509 US —, 61 USLW 4641) (see, dissenting opn, at 551,552,554-555). There, a parochial school student sought a sign language interpreter as "part of a general government program that distributes benefits neutrally to any child qualifying as 'handicapped’ under the IDEA, without regard to the 'sectarian-nonsectarian, or public-nonpublic nature’ of the school the child attends” (509 US, at —, 61 USLW, at 4644). Thus, the law was entirely neutral in relation to individual religions. Here, by contrast, the State engaged in de jure segregation for the benefit of one religious group. Establishment of a public school district intentionally segregated along religious lines is a classic example of government action that must be "surveyed] meticulously.”
Turning then to the required strict scrutiny, I assume, for sake of analysis, that the "intractable problem” (Governor’s Mem approving L 1989, ch 748, 1989 McKinney’s Session Laws of NY, at 2429) of delivering special education services to Satmar children presented a compelling, secular government interest. Indeed, if protecting citizens against abusive solicitation practices may be considered compelling (see, Larson v Valente, 456 US, at 248), surely the provision of special education services qualifies.
Nevertheless, in my view the statute violates the Establish *537 ment Clause because the legislative response plainly went further than necessary to resolve the problem. While defendants and the dissent characterize the new school district simply as a "neutral site” for the delivery of special services (see, Wolman v Walter, 433 US 229, 248), this legislation, establishing an entirely new and separate school district, is significantly broader. Interestingly, although the dissent stresses that only a facial challenge is presented, it relies on how the statute has been implemented — for example, that the new district presently provides only special education services. On this facial challenge, the Court must consider the full scope of the statute, which creates a new school district vested with "all the powers and duties of a union free school district’’ (L 1989, ch 748; emphasis added).
The impact of the Legislature’s remarkable action of carving out a new school district coterminous with a religious enclave must not be assessed in a vacuum but measured against history. For almost 40 years, ever since the landmark decision in Brown v Board of Educ. (347 US 483), government-sponsored segregation efforts have been unlawful (see, e.g., United States v Scotland Neck Bd. of Educ., 407 US 484, 489-490 [carving out new school district from existing one impermissible because it impedes desegregation]; compare, Education Law § 2590-b [3] [a] [vi] ["heterogeneity of pupil population” a criterion in creating local school districts]; Mississippi Univ. for Women v Hogan, 458 US 718 [gender-based admissions policy unconstitutional]). Against this historical backdrop, the "symbolic impact” (Grand Rapids School Disk v Ball, 473 US, at 39Q) of creating a new school district to serve the needs of a particular religious group cannot be overstated.
The law’s overbreadth, however, goes beyond symbolism. The impasse between Monroe-Woodbury and the Satmarer concerned only special education services for disabled children. Nevertheless, the Legislature responded by creating a new public school district vested with all the powers of a union free school district, which are vast.[5] 6 Thus, for example, there is no legal impediment to the new district’s operation of *538 a public school program for nondisabled children if it chose to do so. Manifestly, the delegation of such power to the new district demonstrates that the legislation exceeded the problem that engendered it.
Perhaps the best evidence that the Legislature’s resolution was not closely fitted to the problem was the availability of more moderate measures to accomplish its goal (see, Church of Lukumi Babalu Aye, 508 US, at —, 113 S Ct, at 2229-2230). Accepting the parents’ stated reasons for not sending their children to the public schools — psychological harm to the children from being thrust into a strange environment — then presumably the parents would be satisfied with a program directed to mitigating that trauma, without necessarily segregating the children.
Even if some sort of separate educational services were the only viable alternative, that could have been achieved without carving out a new school district. The Legislature could have, *539 for example, enacted a law providing that the Monroe-Wood-bury School District should furnish special education services to these children at sites not physically or educationally associated with their parochial schools. That would have satisfied the parents, and would supersede any residual claim by the District that New York statutory law precludes that action.
Such narrowly tailored legislation would not, in my view, offend the Establishment Clause. In Wolman v Walter (433 US 229, 248), the Supreme Court held that "providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion.” The Court had struck down previous efforts to provide remedial services on the premises of parochial schools (see, Meek v Pittenger, 421 US 349, 367-372), but as the Court explained in Wolman, the "dangers perceived in Meek arose from the nature of the institution, not from the nature of the pupils” (Wolman v Walter, 433 US, at 247-248; see also, Grand Rapids School Dist. v Ball, 473 US 373, 386-389; Aguilar v Felton, 473 US 402, 412). In the present circumstances, a law providing special education services to Satmar children at neutral sites can be considered closely fitted to a compelling government interest. Creating a new public school district cannot.
The foregoing analysis is consistent with, and indeed substantially overlaps, Lemon’s second prong. The government may not make religion relevant to a person’s political standing in the community (Lynch v Donnelly, 465 US 668, 687 [O’Connor, J., concurring]). If the government’s response to a problem affecting a religious group is broader than reasonably necessary, it presents at least the perception of official favoritism or endorsement of that religion, in violation of Lemon’s second prong (see, Allegheny County v Greater Pittsburgh ACLU, 492 US 573, 592-594, supra). By carving out a fully empowered, whole new school district in these circumstances, the Legislature has also transgressed Lemon.
III.
This Court’s decision returns the parties to square one. It is ironic that in the wake of the Legislature’s creation of a new school district for the Satmar, Monroe-Woodbury now argues that the "provision of secular instructional services to students of the same faith at a neutral site is constitutionally *540 permissible.” This approach by Monroe-Woodbury could well obviate the need for any further legislative intervention.

. The Lemon test has been criticized by many of the Supreme Court Justices in their individual opinions (see, Lamb’s Chapel v Center Moriches Union Free School Dist., 508 US —, —, 113 S Ct 2141, 2149-2150 [Scalia, J., concurring] [collecting cases]). Indeed, the test was not even invoked by the majority in Zobrest v Catalina Foothills School Dist. (509 US —, 61 USLW 4641), the Court’s most recent Establishment Clause case.

. Zobrest v Catalina Foothills School Dist. (508 US —, 61 USLW 4641) (sign language interpreter for parochial school student); Witters v Washington Dept. of Servs. for Blind (474 US 481) (aid to blind student attending sectarian college); Aguilar v Felton (473 US 402) (public school instructors teaching on premises of parochial schools); Grand Rapids School Dist. v Ball (473 US 373) (similar); New York v Cathedral Academy (434 US 125) (reimbursement for recordkeeping and testing); Wolman v Walter (433 US 229) (textbooks, diagnostic services, remedial education, standardized tests, field trip transportation); Roemer v Maryland Pub. Works Bd. (426 US 736) (grants to private colleges); Meek v Pittenger (421 US 349) (textbooks, instructional materials and various on-site services); Committee for Pub. Educ. v Nyquist (413 US 756) (funds for maintenance and repair, tuition reimbursement and tax benefits to parents); Levitt v Committee for Pub. Educ. (413 US 472) (funds for testing); Hunt v McNair (413 US 734) (revenue bonds for sectarian-affiliated universities); Tilton v Richardson (403 US 672) (Federal construction grants); Lemon v Kurtzman (403 US 602) (teachers’ salaries, textbooks, instructional materials); Earley v DiCenso (403 US 602) (salary supplements); Board of Educ. v Allen (392 US 236) (textbooks); Everson v Board of Educ. (330 US 1) (bus transportation).

. Lee v Weisman (505 US —, 112 S Ct 2649) (prayer at graduation ceremony); Edwards v Aguillard (482 US 578) (statute prohibiting teaching of evolution unless accompanied by instruction in theory of "creation science”); Wallace v Jaffree (472 US 38) (period of silence for "meditation or voluntary prayer”); Stone v Graham (449 US 39) (posting of Ten Commandments); Abington School Dist. v Schempp (374 US 203) (prayer and Bible reading at beginning of each school day); Engel v Vitale (370 US 421) (prayer); Epperson v Arkansas (393 US 97) (statute barring instruction in theory of evolution); McCollum v Board of Educ. (333 US 203) (religious instruction by sectarian teachers); see also, Lamb’s Chapel v Center Moriches Union Free School Dist. (508 US —, 113 S Ct 2141) (use of school premises by religious group); Westside Community Bd. of Educ. v Mergens (496 US 226) (same); Widmar v Vincent (454 US 263) (same); Zorach v Clauson (343 US 306) (students released from public school classes for religious instruction).

. A "benefit” addressed to one religious group may be related to Free Exercise values, and thus would not be constitutionally objectionable if sufficiently tailored. For example, a State may choose to exempt from criminal drug laws the possession of peyote by those whose religious beliefs mandate sacramental use of that drug (see, Employment Div., Ore. Dept. of Human Resources v Smith, 494 US, at 890). But if the exemption is too broad — permitting, for instance, members of the affected religious group to also possess and traffic in heroin and cocaine, that could, in my view, violate the Establishment Clause.

. "The board of education of a union free school district, in addition to having in all respects the superintendence, management, and control of the educational affairs of the district, is given numerous more specific duties and powers. Thus, it is empowered and duty-bound to adopt bylaws and rules for its government as proper in the discharge of its duties; establish rules and regulations concerning the order and discipline of the schools; *538 provide fuel, furniture, apparatus, and other necessaries for the use of the schools; prescribe courses of study; regulate the admission of pupils and their transfer between classes or departments; provide milk, transportation, and medical inspection of schoolchildren; provide home-teaching or special classes for handicapped and delinquent children; provide, maintain, and operate, under prescribed circumstances, cafeteria or restaurant service and other accommodations for teachers and other employees, pupils, and the elderly; and prescribe, and, when authorized, furnish, textbooks to be used in the schools. It is also authorized to purchase property and construct school buildings and facilities thereon; take and hold possession of school property; lease premises, and lease-purchase instructional equipment, for school purposes; sell and exchange school property; insure school property; sue to recover damages, and offer monetary rewards for information leading to the arrest and conviction of persons, for vandalism of such property; provide, where authorized, for lighting, janitorial care, and supervision of highway underpasses; alter former schoolhouses for use as public libraries; and explore, develop, and produce natural gas for district purposes. It is authorized to appoint teachers and librarians and to raise by tax on the property of the district any moneys required to pay the salaries of teachers employed, and also to appoint committees to visit schools and departments under its supervision and report on their condition. Likewise the board is empowered to discharge district debts or other obligations. It has prescribed powers and duties with respect to self-insurance by the district, accident insurance of pupils, insurance against personal injuries incurred by school volunteers, and group insurance and workers’ compensation coverage of teachers and other employees, and may, when authorized, withhold from employees’ salaries sums to be paid to specified credit unions. Finally, the board possesses all the powers, and is subject to all the duties, of trustees of common school districts, and has all the immunities and privileges enjoyed by the trustees of academies in this state.” (94 NY Jur 2d, Schools, Universities, and Colleges, § 99, at 152-157 [1991] [citations omitted].)