**Matthew NIEUWENHUIS by His Parents and Next Friends, Melvin and Peggy NIEUWENHUIS, and Melvin Nieuwenhuis and Peggy Nieuwenhuis, Plaintiffs,**

**v.**

**DELAVAN–DARIEN SCHOOL DISTRICT BOARD OF EDUCATION, Defendant.**

No. 96–C–0522.

United States District Court,
E.D. Wisconsin.

March 4, 1998.

John V. McCoy, Bode, Schroeder & Carroll, Waukesha, WI, for plaintiff.

David E. Rohrer, Lathrop & Clark, Madison, WI, for defendant.

**DECISION AND ORDER GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING THE ACTION**

REYNOLDS, District Judge.

Matthew Nieuwenhuis is a child with a history of hearing and speech-related disabilities. Melvin and Peggy are his parents. During all times relevant to this action, the

family has lived within the Delavan–Darien School District ("DDSD"). At base, this suit seeks to determine who is responsible for what aspects of educational support Matthew is entitled to under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401, et seq. While the IDEA claims dominate this suit, also at issue are claims under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U .S.C. § 2000bb, et seq., and the First Amendment to the United States Constitution.[1]

Before the court are the parties' cross motions for summary judgment as to all claims. Because the court finds (1) that the DDSD has met its obligations under the IDEA and the First Amendment with respect to Counts I, II, IV, V, and VI, (2) that the IDEA claim in Count III is barred as untimely, and (3) that the RFRA claim (Count VII) is barred by *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the court denies the plaintiffs' motion for summary judgment, grants the defendant's motion for summary judgment on all claims, and dismisses this action.

## THE BASIC CONTOURS OF THE IDEA

In order for the facts, as laid out below, to assume any meaning, it is necessary to sketch contours of the legal backdrop of the IDEA. The IDEA allocates federal funding to those states that commit to the provision of a free, appropriate, public education ("FAPE") to children with disabilities. 20 U.S.C. §§ 1400(c) and 1412. A FAPE is defined by 20 U.S.C. § 1401(a)(18) as:

special education and related services which

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program required under section 614(a)(5) [20 U.S.C. § 1414(a)(5) ].

Recipient states must erect means for the identification, evaluation, and placement of children with disabilities. The IDEA dictates certain features of these mechanisms and provides procedural protections for the child as well as administrative and judicial review and remedies in the event these protections are breached. Chapter 115, Subch. V of the Wisconsin Statutes, embodies that state's legislative implementation of the IDEA.

One aspect of the IDEA, codified at 20 U.S.C. § 1414(a), requires a participating state to identify and locate children entitled to specialized educational services. Section 115.80(1) of the Wisconsin Statutes requires certain people with "reasonable cause to believe … that a child has exceptional educational needs" ("EEN") to initiate the process by which appropriate services are identified and delivered.

Once a child is identified as potentially entitled to services under the IDEA and state laws promulgated thereunder, the school district is required to appoint a Multidisciplinary Team ("M–Team") to determine whether the child does in fact have exceptional educational needs. Wis.Stat. § 115.80(3)(d) (1995). Should such needs be found, the school district establishes a team, the constitution of which is controlled by 20 U.S.C. § 1401(a)(20), to develop an Individualized Education Program ("IEP"). The IEP establishes the child's educational program so as to meet the child's exceptional educational needs, documents the child's educational performance, and outlines educational goals and timetables. Any necessary education-related services called for by the IEP

---

1. Due to the nature of this case, this decision uses an unusual number of abbreviations and acronyms. To aid the reader, these and what they represent are laid out here:

Delavan Christian School ("DCS"), Delavan–Darien School District ("DDSD"), Exceptional Educational Need ("EEN"), Free Appropriate Public Education ("FAPE"), Individuals With Disabilities Education Act ("IDEA"), Individualized Education Plan ("IEP"), Religious Freedom Restoration Act ("RFRA"), and Wisconsin School for the Deaf ("WSD").

are to be provided at public expense. 20 U.S.C. § 1401(a)(18).

If the school district is unable to provide the appropriate services in a public school, the district must place the child in a private school that can render the appropriate services. 20 U.S.C. § 1413(a)(4)(B). What becomes less clear is the district's obligation under the IDEA when a child enrolls in a private school, not because services are unavailable at a public school, but because the child and his family voluntarily opt for private school placement. This is a central issue in the case at bar.

In this case, the Nieuwenhuises allege in Count I that DDSD's refusal to provide a sign-language interpreter for Matthew's use at a private school violates the IDEA. In Count II, the Nieuwenhuises contend that DDSD declined to provide Matthew with an FM system prior to August 1995, thereby denying Matthew FAPE in violation of the IDEA. The third count alleges that DDSD failed to identify Matthew as a child with exceptional educational needs in a timely fashion. The fourth count alleges that a delay in an administrative decision regarding Matthew's needs violated both the IDEA and 42 U.S.C. § 1983. Count V alleges a generalized failure to provide a FAPE, resulting in costs and legal fees. Counts VI and VII allege that DDSD's failure to provide services at the sectarian, private school Matthew attends that would be provided if Matthew attended public school violates the Free Exercise Clause of the First Amendment to the United States Constitution and RFRA.

## FACTUAL BACKGROUND

Matthew has, at all times relevant to this lawsuit, suffered from serious hearing loss in both ears, as well as speech and language difficulties. As a result, he is a child with a disability and with EEN within the meaning of the IDEA. The disputes before the court date back to the period in which the DDSD was made aware of Matthew's EEN. On May 22, 1990, Audiologist Susan Mueller sent a letter ("Mueller letter") discussing Matthew's hearing difficulties to the Wisconsin Bureau for Children with Physical Needs. A short time later, a copy of this letter was sent to James Santy, the Director of Pupil Services for DDSD. Further, the plaintiffs allege that, shortly after June 7, 1990, Phil Knobel, Director of Special Education for Walworth County, received a copy of a letter ("Wolter letter") from Dr. Robert K. Wolter, an associate of Mueller, to one Syd Foster which confirmed Mueller's evaluation of Matthew's hearing loss.

Plaintiffs assert, and the defendant denies, that the Mueller and Wolter letters each constituted an EEN referral which, in such case, should have triggered a process for assessing and meeting Matthew's education needs. The DDSD claims that it became aware of Matthew's EEN on November 14, 1991, when Matthew's parents, themselves, referred Matthew to the Walworth County Handicapped Children's Education Board. On this same day, the DDSD issued a Notice of Receipt of Referral. As revealed in the discussion below, this dispute is not one of material fact.

On March 4, 1992, an M–Team evaluation of Matthew determined that he had an EEN in speech or language and in hearing. Matthew's first IEP meeting took place on March 12, 1992. This IEP called for 100% participation in regular education with speech and language therapy twice a week and therapy for the hearing impaired once a week. No other necessary, related services were listed. This IEP was scheduled to take effect on March 31, 1992. At the time, Matthew attended kindergarten at Delavan Christian School ("DCS"), a private sectarian school.

On May 28, 1992, a similar IEP was developed for Matthew, designed to have effect from September of 1992 to June 1993. During this period Matthew was home-schooled. Another IEP was developed on May 11, 1993, to cover the period between September 1993 and May 1994. For the purpose of the controversy at hand, it was similar to the preceding IEPs. Matthew continued to be home-schooled for the first semester of the 1993–94 school year. At an IEP review December 10, 1993, Matthew's IEP was modified to include an "FM-system for use in the class-

room as needed."[2] In December of 1993, pursuant to a placement offer by DDSD, Matthew was enrolled in the Wisconsin School for the Deaf ("WSD"), a public school operated by the State of Wisconsin.

Matthew's May 2, 1994 IEP, designed for August 1994 to June 1995, continued the use of the FM-system. The DDSD's placement offer provided for continued attendance at WSD for the 1994–95 school year, during which Matthew would be in third grade.

Matthew's May 17, 1995 IEP, for the period August 1995 to June 1996, called for 50% regular education and 50% special education as well as therapy, use of a voice interpreter, use of an FM-system, use of a sign language interpreter, and transportation services. DDSD's placement offer split Matthew's time between WSD and a public school within the DDSD.

By way of a letter to Phil Knobel, dated June 4, 1995, Matthew's parents accepted the WSD aspect of the placement offer but rejected the placement at the other public school, opting instead to send Matthew to DCS when he was not attending classes at WSD. The letter further requested that the DDSD fund a sign language interpreter for Matthew's use at DCS. Matthew's parents further allege that this letter demanded a due process hearing. However, the stipulated record indicates that, while the June 4 letter made no mention of a "due process hearing," such a request appears in an August 9, 1995 letter from the plaintiffs' counsel to Phil Knobel. (Dean Aff., Ex. C, Doc. 6 (Aug. 9 letter); Doc. 7 (June 4 letter).)

Following an August 14 school board meeting on the subject, at which Matthew's parents were present with counsel, the DDSD sent counsel for Matthew's parents (with a copy to his parents) a letter dated August 17, 1995, denying the request for DDSD funding of an interpreter's services at DCS. This decision was based on the undisputed appropriateness of Matthew's IEP and the fact that neither the IDEA itself, nor the Supreme Court's interpretation in *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), required funding of interpreter's services for use at a private sectarian school. Finally, the DDSD expressed concern that such funding may violate the Establishment Clause of the Constitution of the State of Wisconsin, Art. I, § 18. In the same letter, the DDSD did agree to provide an interpreter for use in public school, presumably WSD, where Matthew would be spending a portion of his school day. A letter dated August 24, 1995, expresses the DDSD's willingness to provide an FM-system for Matthew's use.

In a letter dated August 25, 1995, plaintiffs' counsel reminded Knobel that plaintiffs' counsel "[i]n a letter dated August 9, 1995 ... demanded a due process hearing." (Dean Aff., Ex. C, Doc. 3–1.) The letter outlined plaintiffs' view of the law, requested delivery of the DDSD's files regarding Matthew, and expressed the plaintiffs' desire to conduct a hearing in a timely fashion.

On August 28, 1995, a process began by which the parties attempted to select an acceptable hearing officer. Under Wis.Admin.Code P.I. § 11.12(c)(1) (1995), the DDSD appointed a hearing officer by way of a letter dated August 28, 1995. This would-be officer was rejected by Matthew's parents under P.I. § 11. 12(c)(2) (1995). On August 30, 1995, the DDSD informed Wisconsin's Department of Public Instruction ("DPI") that the parties could not agree on a hearing officer. On September 6, 1995, under P.I. § 11.12(c)(2), the DPI submitted to the parties three names; Matthew's parents would strike one, the DDSD would strike one, and the remaining name would be that of the hearing officer. *Id.*

The DDSD informed Matthew's parents that the DDSD might request that one Craig Fiedler be replaced in the pool with another candidate, based on a professional conflict which would disqualify Fiedler from the field of three under P.I. § 11.12(c) (1995). On September 8, 1995, the DDSD informed Matthew's parents that DDSD had reconsidered and would not make the request. In a September 11, 1995 letter, Matthew's parents struck one of the three names. In a September 13, 1995 letter, the DDSD did request

---

**2.** Apparently, an FM-system involves the use of microphone/transmitter and receiver.

that another of the three candidates, Jean DiMotto, be replaced because she had previously worked for the law firm then representing Matthew and his parents. On September 15, 1995, Matthew's parents objected to this request noting that P.I. § 11.12 (1995) authorizes the DDSD to strike a name but not to ask that a name be replaced. Based on the submissions of the parties, the DPI submitted three new names to the parties on September 19, 1995.

On September 21, Matthew's parents struck the first name. On October 10, 1995, the district struck a second, leaving Attorney Bonnie Liss as the Hearing Officer. Meanwhile, however, Matthew's parents, in a letter dated October 2, 1995, objected to the fact that the 45–day deadline for the due process hearing decision, established by Wis.Admin.Code P.I. § 11.10(4)(b); 34 C.F.R. § 300.512(a); and Wis.Stat. § 115.81(6), had elapsed. On October 16, 1995, Hearing Officer Liss granted an extension of the 45–day deadline. On October 20, 1995, Matthew's parents objected to this extension on the grounds that, while Wis.Admin.Code P.I. § 11.10, 34 C.F.R. § 300.512, and Wis.Stat. § 115.81 all empower a hearing officer to grant extensions, the statutory and regulatory provisions are silent as to whether such extensions can be granted retroactively.

By the end of October 1995, the parties had resolved their differences regarding the transmittal of Matthew's records from the DDSD to Matthew's parents. Rather than conduct an evidentiary hearing, the parties submitted to Hearing Officer Liss their stipulations of fact and briefs on which to decide the matter. The issues for her consideration, as framed by Matthew's parents, were: (1) Whether the DDSD was obligated to provide a sign language interpreter for Matthew's use at DCS; (2) whether the DDSD failed in its obligation to identify Matthew as a student with EEN and to assess and provide him services; (3) whether Matthew and his parents were afforded due process in resolving these disputes; and (4) whether the DDSD failed to provide Matthew "with necessary FM system services prior to August 1995." (Dean Aff., Ex. A, Liss Decision of Feb. 6, 1996.)

On February 6, 1996, Hearing Officer Liss issued a decision which found (1) that DDSD was not required to provide a sign-language interpreter for use at DCS; (2) that the DDSD did not "violate procedural errors [sic]" in identifying, assessing, and providing Matthew services; (3) that Matthew and his parents had been afforded due process; and (4) that the DDSD did not fail to provide Matthew "with necessary FM system prior to August 1995." *Id.* at 17.

This matter was then transferred to Review Officer Kaye Vance pursuant to Wis.Admin.Code P.I. § 11.11(4) (1996). On March 22, 1996, Review Officer Vance rendered her decision, finding that the DDSD met its obligation to provide Matthew with FAPE, that the DDSD was not required to provide a sign-language interpreter for use at DCS, that no due process violations occurred, that the DDSD was not obligated to provide an FM-system prior to August 1995, and that "although procedural irregularities were present, these did not substantively impact on [Matthew's] FAPE." (Dean Aff., Ex. B, Vance Decision of Mar. 22, 1996 at 19.)

On May 1, 1996, Matthew's parents, individually and on behalf of Matthew, filed suit in this court under 20 U.S.C. § 1415(e). The complaint alleges five violations of the IDEA (Counts I–V):(1) that the DDSD's refusal to provide a sign-language interpreter for Matthew's use at DCS denied Matthew a FAPE; (2) that the DDSD's failure to provide Matthew with an FM-system prior to August 1995 denied Matthew a FAPE; (3) that the DDSD failed to identify, locate, and evaluate Matthew as required by 20 U.S.C. § 1414(a), thereby depriving him of a FAPE; (4) that the DDSD failed to insure that a due process hearing decision was rendered within the 45–day time period for such decisions; and (5) that the DDSD's failure to provide Matthew a FAPE has caused an incursion by the plaintiffs of legal fees and litigation costs. The complaint proceeds to allege that the DDSD's refusal to provide a sign-language interpreter for use at DCS violates the First Amendment to the United States Constitution, giving rise to an cause of action under 42 U.S.C. § 1983, (Count VI) and the Religious Freedom Restoration Act ("RFRA"),

42 U.S.C. § 2000bb, et seq. (Count VII). Both parties have moved for summary judgment as to all claims.

## DISCUSSION

### I. The Free Exercise and RFRA Claims

For the sake of clarity, before proceeding to the IDEA claims (Counts I–V), the court will address the plaintiffs' § 1983 (Free Exercise) and RFRA claims (Counts VI and VII). For these claims, the standard summary judgment methodology would apply. However, because there are no disputes of material facts as to these claims, and because there are cross motions for summary judgment before the court, the § 1983 and RFRA claims present only questions of law; therefore, summary judgment is appropriate. Because the answers to these questions of law favor the DDSD, Counts VI and VII will be dismissed.

#### A. Free Exercise

■ The plaintiffs' Free Exercise claim is rooted in the fact that the DDSD will not provide a sign-language interpreter for Matthew's use at DCS, a private, sectarian school. This claim fails because a refusal to extend benefits available in a public school to students enrolled in private school does not burden religious exercise. More to the point, as discussed in greater detail below, in administering benefits to children with disabilities, the DDSD is entitled to exercise the discretion that is expected of educational professionals. Nothing in the Constitution requires that benefits afforded in a private school mirror those the government provides public school children. The fact that Matthew's parents, in opting to send Matthew to a private school, have also opted out of some of the benefits available at a public school, does not violate the Free Exercise Clause.

■ A facially neutral government act does not violate the Free Exercise Clause of the First Amendment merely because it has an incidental effect on religious practice. *Employment Div., Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct.

1595, 108 L.Ed.2d 876 (1990). *See also Goodall v. Stafford County Sch. Bd.,* 60 F.3d 168 (4th Cir.1995) (Under *Smith,* school district's refusal to provide "a cued speech transliterator" at private sectarian school was not actionable under Free Exercise Clause). *Smith,* however, suggests there may be an exception to this rule, the "Free Exercise Plus" exception, when government action involves "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as ... the right of parents ... to direct the education of their children." *Id.* at 881 (*citing Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).

■ This potential exception, however, is inapposite in this case. In this case, in contrast to *Smith, Yoder,* and *Pierce,* the government is neither compelling an act that violates a religious belief nor forbidding an act required by religious belief.[3] The *Smith* court limited the "Free Exercise Plus" exception: " 'We do not mean to say that religious groups and the press are free from all financial burdens of government.... It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a sermon.' " *Id.* 881 n. 1 (*quoting Murdock v. Pennsylvania,* 319 U.S. 105, 112, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas)).

■ In the case at bar, the evidence demonstrates that the DDSD employed a measure of discretion that the DDSD believed it was permitted to under the IDEA in cases involving students enrolled in private schools by their parents. Therefore, if *Smith* suggests that Free Exercise rights coupled with another constitutional right may defeat otherwise neutral government action, the case at bar falls within the limits on such a claim discussed in *Smith's* footnote 1. Specifically, the fact that those who opt out of public

---

**3.** It should be noted that no claim arises in this case from Matthew's placement and attendance at the WSD, a public institution.

school may not enjoy all the benefits of the IDEA is a general financial function of governmental administration, rather than a burden targeted at protected behavior. *See, supra, Smith,* 494 U.S. at 882 n. 1 (*quoting Murdock v. Pennsylvania,* 319 U.S. at 112.)

■ The plaintiffs' Free Exercise claim fails for another reason as well. The DDSD's refusal to provide a publicly-paid interpreter at DCS does not create so substantial a burden as to call into constitutional question DDSD's action. In *Fleischfresser v. Directors of Sch. Dist. 200,* 15 F.3d 680 (7th Cir.1994), the court of appeals reviewed a claim that the Free Exercise Clause forbade a public school from including in its curriculum a reading program that exposed the plaintiffs' children to religious beliefs in conflict with those of the plaintiffs. The court inquired as to whether the government has placed a "substantial burden" on the observation of "a central religious belief or practice." *Id.* at 689 (*quoting Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). The court found no such burden because the defendants were neither "precluding the parents from meeting their religious obligation to instruct their children [nor] ... compel[ling] the parents or children to do or refrain from doing anything of a religious nature." *Id.*

In the case at bar, even if the court characterizes DDSD's decision to provide no interpreter at DCS as a "burden," the burden is placed on the act of sending a child to a private school, not on a religious practice. Further, the facts demonstrate, on a practical level, the absence of a forbidden burden. First, Matthew is, in fact, enjoying a private education at DCS. Second, Matthew's attendance for part of the school day at WSD, a public institution, undermines the assertion that broader, publicly-funded benefits at public schools impinge on the religious practices of Matthew and his family. The benefits of attending WSD are such that Matthew's parents have agreed to his attendance there. The fact that, in their judgment, attendance at another public school does not hold the same benefit does not give rise to a constitutional violation. *See K.R. by M.R. v. Anderson Community Sch. Corp., (K.R.II)*

125 F.3d 1017, 1019 (7th Cir.1997) (offer to provide services at public school but not at private school does not infringe on Free Exercise Clause). Finally, the plaintiffs' reliance on *Zobrest. v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), is uninstructive. That case held that the public provision of a sign-language interpreter for use in a private sectarian school did not violate the Establishment Clause of the First Amendment, i.e., the Constitution does not forbid such a provision. This principle, however, does not mean that the Constitution requires such provision. The plaintiffs' Free Exercise Claim (Count VI) shall be dismissed.

**B. Religious Freedom Restoration Act**

■ Since the filing of this action, the Supreme Court has issued *City of Boerne v. Flores,* — U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which struck down RFRA. Specifically, the court held that Congress had exceeded its authority under § 5 of the Fourteenth Amendment to "enforce" the guarantees of the Constitution by purporting to expand those guarantees with the enactment of RFRA. Therefore, Count VII of the complaint will be dismissed.

## II. Counts I–V: The IDEA

### A. Standard of Review

■ Procedurally, the IDEA claims in this action seek review of the administrative decisions rendered by Hearing Officer Liss and Review Officer Vance. In reviewing these decisions, the district "court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.S. § 1415(e)(2). That is, this court does not merely ascertain whether the administrative decisions are supported by "substantial evidence" in the record, as is typical of other types of judicial review of administrative decisions. Rather, "a district court must independently determine whether the requirements of the Act have been satisfied." *Board of Ed. of Murphysboro v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1166 (7th

Cir.1994). At the same time, the district court is bound to view with some deference the decision of the administrative officers who are assumed to possess a greater measure of expertise in educational policy. *Id.*

### B. Failure to Provide an Interpreter at DCS as a Denial of a FAPE

#### *The Relevance of the IDEA Amendments of 1997*

As the parties know, this court required them to rebrief the instant motion because some of the law involved in this case changed while the suit was pending. Specifically relevant here are the IDEA amendments of 1997. These amendments are not retroactive and therefore they do not affect those claims that seek redress of alleged wrongs that predate the amendments: Count II (failure to provide FM-system prior to August 1995), Count III (failure to identify, locate, and evaluate Matthew in 1990), Count IV (delay in due process hearing), and Count V (fees and costs).

Count I (failure to provide interpreter at DCS), however, involves conduct that straddles the amendments of 1997. If these amendments have altered the IDEA in a manner relevant to Count I, two analyses would be necessary, one for pre-amendment conduct and one for post-amendment conduct. Based, however, on an analysis of the IDEA and the amendments, the court finds that the 1997 amendments do not change the effect of the IDEA on this case but merely clarify it. The result is that the DDSD was not and is not required by the IDEA to provide a sign-language interpreter, at public expense, for Matthew's use in a private school in which Matthew was voluntarily enrolled by his parents, and Count I will be dismissed.

 The IDEA requires participating states to make a FAPE available to all eligible students. The IDEA recognizes three types of placement scenarios for disabled students: The first is where the disabled student is provided needed services at and attends a public school. The second, involves the student whose IEP placement offer places him in a private school. For these two groups of students, the IDEA requires the provision of a FAPE that includes public funding of all special education and related services. *K.R. v. Anderson Community Sch. Corp.* ("K.R.I"), 81 F.3d 673 (7th Cir.1996), *vacated for reconsideration in light of IDEA amendments of 1997,* —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997); *see also* 20 U.S.C. 1413(a)(4)(B)(i) (private school placement at no cost to parents where placed by educational agency as means of providing FAPE). With regard to the third group of students, those placed in private schools voluntarily, the IDEA, prior to the 1997 amendments, required that school districts provide "for the participation of such children in the program assisted or carried out under this part by providing for such children special education and related services." 20 U.S.C. § 1413(a)(4)(A).

The implementing regulations shed some light on what obligations § 1413(a)(4)(A) imposed on school districts with regard to students voluntarily enrolled in private school. The plaintiffs zero in on 34 C.F.R. § 76.654(a) which requires the provision to private school students of "comparable benefits" to those provided public school children. The Seventh Circuit has examined in detail and rejected just this argument. Finding that both the statutes themselves and other implementing regulations distinguish between IDEA-eligible private school children placed by the school district and those placed in private school by their parents despite the availability of a FAPE in a public institution, the court held that reading 34 C.F.R. § 76.654(a) to require the same benefits for both groups would be inconsistent with the statute itself. *K.R. I,* 81 F.3d at 679–80.

 Taken as a whole, the regulatory scheme reflects the fact that under the IDEA, when the parent of an eligible child opts out of a public school where a FAPE could be provided, that parent is opting for a lesser entitlement. Stated differently, the IDEA imposes on participating states a comprehensive burden with regard to eligible children in the public schools. In contrast, the IDEA does not impose so great a burden on these states with regard to eligible children who forego a public education in favor

of a private one. For example, 34 C.F.R. § 300.451(a) helped define a school district's obligations to provide benefits to voluntarily-placed private school children under 20 U.S.C. § 1413(a)(4)(A), by requiring such provision only "to the extent consistent with ... [such students'] number and location and location in the State." The obligation toward students opting for private school was further defined as requiring the district to provide "a genuine opportunity for equitable participation" in services under the IDEA. 34 C.F.R. § 76.651. In applying this requirement, the "essential component is that of opportunity." *K.R. I*, 81 F.3d at 680. Under this standard, once a "public school makes available the necessary service at a public institution, giving the disabled student a genuine opportunity to participate, and nothing in the record indicates that it has otherwise abused its discretion, the public school has discharged its obligation." *Id.*

The record developed by the parties demonstrates that the DDSD gave Matthew a genuine opportunity to participate in all of the services called for by his IEP. Even after Matthew's parents spurned part of the DDSD's placement offer, opting instead for a private school, the DDSD agreed to make available an FM-system for Matthew's use. On these facts, it cannot be said that the DDSD abused its discretion.

■ What remains is the question as to whether the 1997 amendments alter this decision. Upon examination, the court finds to the contrary—that, in fact, the amendments, amplify rather than diminish, the limits on a school district's responsibility under the IDEA to a child with disabilities who is voluntarily placed in private school.

Public Law 105–17 (1997) enacted provisions that speak to precisely the point in contention. As amended, 20 U.S.C. § 1412(a)(10) (Sept. 1997Supp.) provides:

> To the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary and secondary schools, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special edu-

cation and related services *in accordance with the following requirements* ...:

> (I) Amounts expended for the provision of those services by a local educational agency shall be equal to a proportionate amount of Federal funds made available under this part.

> (II) Such services may be provided to children with disabilities on the premises of private, including parochial, schools, to the extent consistent with law.

*Id.* at (A)(i) (emphasis added).

> Subject to subparagraph (A), this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

*Id.* at (C)(i).

■ These additions do not change, but rather amplify and clarify, the intended limitations that the IDEA places on entitlements for children voluntarily placed in private schools despite the offer of a FAPE in public institutions. *K.R. II*, 125 F.3d at 1019. The plaintiffs urge this court not to give dispositive effect to *K.R. II* because, in their view, the Court of Appeals ignored the language "Subject to subparagraph (A)" which appears in § 1412(a)(10)(C)(i). However, this court has no such liberty to deviate from the established case law of this circuit. Even if this court were convinced that the Seventh Circuit erred, correction of such error must be left to the appellate courts. *See Donohoe v. Consolidated Operating & Prod. Corp.*, 30 F.3d 907 (7th Cir.1994). Moreover, this court is confident that the Seventh Circuit's opinions in *K.R. I* and *K.R. II* represent, in fact, an accurate analysis of the IDEA.

*K.R. I* established that, prior to the amendments of 1997, a school district need only provide an eligible child who is voluntarily placed at a private school with a genuine opportunity for equitable participation in those services called for by the child's IEP. The amendments of 1997, specifically 20 U.S.C. § 1412(a)(10)(C), clarify a district's

duty by specifying that such equitable participation need not be provided "at a private school or facility" if the district has offered a FAPE and the child's parents have nonetheless placed the child in a private setting.

▉▉ The plaintiffs' reliance on the "subject to subparagraph (A)" language in § 1412(a)(10)(C) is misplaced because it presumes that § 1412(a)(10)(A) requires something more than a genuine opportunity for equitable participation. In other words, the requirements of § 1412(a)(10)(A) are fulfilled when a school district makes the necessary services available at a public institution and does not otherwise abuse its discretion. *K.R. I*, 81 F.3d at 680. Section 1412(a)(10)(C), created by the amendments of 1997, confirms that such services need not be provided on the premises of a private institution.

The above discussion establishes that the DDSD was not required, either before or after the 1997 amendments to the IDEA, to provide a sign-language instructor for Matthew's use at DCS. The DDSD stood ready to meet all of Matthew's EEN and used its discretion to design a placement for Matthew towards this end. This discretion is an exercise of educational expertise, an attribute possessed in far greater abundance by the DDSD and the administrative officers than by this court. Because the DDSD has not abused its discretion, Count I will be dismissed.

C. DDSD's Alleged Failure to Provide Matthew an FM–System Prior to August 1995 and Failure to Identify, Locate, and Identify Matthew in 1990 Following the Mueller and Wolter Letters (Counts II & III)

▉▉ Review Officer Vance found that Counts II and III were barred as untimely filed. While her analysis is persuasive, the parties have not briefed this issue in detail sufficient to allow the court to either accept or reject it as a proper statement of the law. However, the court finds that any statute of limitations that permitted litigating Count III (whether the 1990 letters constituted EEN referrals), some five-and-a-half years after the DDSD's alleged failure, would violate the purposes of the IDEA. Therefore, Count III will be dismissed as untimely.

Count II will be dismissed simply because no evidence suggests that any failure of the DDSD to provide Matthew with the use of an FM-system before August 1995 denied Matthew a FAPE.

1. Timeliness of Administrative Claims Related to the FM–System and the 1990 Letters

▉▉ The DDSD claims that Counts II and III are barred because the plaintiffs demanded a due process hearing too late to litigate these claims. This was also the view taken by Review Officer Vance in the state administrative proceedings. (Dean Aff., Ex. B, Vance Decision of Mar. 22, 1996 at 13.) Neither the IDEA nor Wisconsin law explicitly provide limitations on when parents of an IDEA-eligible child may demand a due process hearing related to a school district's alleged failure to provide a FAPE. Generally, when Congress has failed to create a statute of limitations for a federal cause of action, the courts are instructed to look to an analogous state statute of limitations. *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).

Review Officer Vance examined several potentially analogous Wisconsin statutes of limitations and found them inapplicable insofar as they violated the IDEA's policy of resolving disputes over a child's education as quickly as possible. Instead, she applied a laches-type analysis, finding that an appeal of an IEP is barred once a later IEP takes effect. Thus, she found Matthew's parents' claims—relating to whether the 1990 Mueller and Wolter letters constituted EEN referrals and whether the DDSD had been obligated to provide Matthew an FM-system prior to August, 1995 (Counts II and III in this case)—were barred as untimely.

Review Officer Vance's analysis is persuasive and could be framed under several different theories. When a complained-of IEP has been replaced with another, claims arising from the first IEP could be seen as waived by the parents, or mooted by the intervening IEP, or, as Review Officer Vance found, barred by laches. The court need not pass on whether Vance's laches analysis is a

correct expression of law because any statute of limitations that permitted litigation of Count III (1990 letters as EEN referrals) would be inapplicable as contrary to the policy underlying the IDEA. Further, because Count III (provision of FM-system) substantively fails, the court declines to engage in the statute of limitations analysis as to that count.

The practice of borrowing local statutes of limitations for application to a federal cause of action is qualified: The local limitation cannot be such that its use is inconsistent with federal law or policy. *Wilson*, 471 U.S. at 266–67. The Seventh Circuit has found that "[t]he general policy under the IDEA is to resolve educational disputes as quickly as possible." *Powers v. Indiana Dept. of Educ.*, 61 F.3d 552, 556 n. 3 (7th Cir.1995). Further, the procedures mandated under the IDEA are designed to effectuate up-to-date evaluations and educational programming for eligible children. Thus, the IDEA and the mechanisms by which states implement it must accommodate fair consideration of the many issues attending special education— while keeping pace with the development of the child himself. The IDEA requires "prompt rather then protracted, resolution of disputes concerning the disabled student's education." *Dell on Behalf of Dell v. Board of Educ., Township High Sch. Dist. 113*, 32 F.3d 1053, 1060 (7th Cir.1994). A cause of action designed to resolve these disputes requires "a short limitations period." *Id.*

To permit litigation of claims over five years after they accrued, and after many subsequent events have occurred in the child's education, would hamper an already difficult process. To their credit, Matthew's parents have been closely involved with Matthew's education. The allegations that form Count III were known to Matthew's parents over five years before they raised the claim in the due process hearing. To permit this claim now would frustrate the policy goals of the IDEA. Therefore, the court need not determine the particular statute of limitations that would apply; the court would be precluded by *Wilson*, 471 U.S. at 266–67, from "borrowing" any statute that permitted

this claim at this late date. Count III will be dismissed.

2. Count II—Whether the DDSD's Alleged Failure to Provide Matthew with an FM–System Prior to August 1995 Denied Matthew a FAPE

At an IEP review, December 10, 1993, Matthew's IEP was modified to include an "FM-system for use in the classroom *as needed*" (emphasis added). That same month, Matthew enrolled in WSD where he remained during the entire period at issue. It is undisputed that the WSD maintains FM-systems for use by its students. The plaintiffs make no effort to demonstrate how these arrangements constitute a denial of a FAPE. While Review Officer Vance found this claim time barred, she also ruled that it would not have amounted to a violation of the IDEA. (Dean Aff., Ex. B, Vance Decision of Mar. 22, 1996 at 18.) The plaintiffs proffer neither facts nor legal authority which call into question this substantive decision. Therefore, Count III will be dismissed.

D. Count IV—The Failure to Render a Due Process–Hearing Decision Within 45 days of the Request for Such Hearing

On August 9, 1995, Matthew's parents, by counsel, demanded a due process hearing as a means of challenging various DDSD decisions regarding Matthew's education. Section P.I. 11.10, Wis.Admin.Code, requires that the hearing take place and a decision be rendered within 45 days of a request for such hearing. Section P.I. 11.10 also empowers a hearing offer to extend this time period. On October 16, 1995, Hearing Officer Liss granted an extension of the 45–day deadline.

 Review Officer Vance found that the extension was properly granted and that nothing suggested any bad faith on the part of the DDSD in seeking the extension. (Dean Aff., Ex. B, Vance Decision of Mar. 22, 1996 at 18–19.) Not only do the plaintiffs fail to proffer either fact or law suggesting that this determination should be upset, they fail to explain how the alleged violation of the 45–day deadline is actionable, on its own, under the IDEA. This court will not upset Review Officer Vance's application of state law and Count IV will be dismissed.

### E. Count V—Attorneys Fees and Litigation Costs

Count V of the complaint is rendered moot by the fact that the plaintiffs have not prevailed on any of the substantive claims in this lawsuit. It will therefore be dismissed as moot.

### III. Conclusion

The focus of this lawsuit was a dispute over the DDSD's obligation under the IDEA and United States Constitution to provide Matthew with a publicly-funded sign-language interpreter for use at a private school in which Matthew was enrolled by his parents. In the end, the court is convinced that the DDSD is not so obligated. The IDEA both before and after the 1997 amendments makes clear that Congress did not intend to burden public school districts with obligations to voluntarily-placed private school students that rise to the level of the districts' obligations to students attending public school.

Along with this dispute over Matthew's use of an interpreter at his private school, Matthew's parents have sought to litigate disputes regarding Matthew's education that date back as far as 1990. Having allowed so many years to pass before pursuing the earliest of these disputes—whether the Mueller and Wolter letters of 1990 constituted EEN referrals—would do violence to the ends served by the IDEA. The remaining substantive claims—the DDSD's alleged failure to provide an FM-system prior to August 1995 and the failure to render a hearing decision within 45 days of a demand for a hearing—do not amount to a denial of Matthew's FAPE or an otherwise actionable violation of the IDEA.

The defendant Delavan–Darien School District's motion for summary judgment on all claims is **GRANTED** and this action is **DISMISSED** .