Justice Ingrid Gustafson, concurring.
***470 ¶ 46 I concur in the Majority's Opinion and agree the Tax Credit Program violates our Constitution's prohibition against providing aid to religious schools, and this constitutional deficiency cannot be cured via administrative rule. I write separately to discuss additional grounds upon which the Tax Credit Program creates an indirect payment under Article X, Section 6(1), of the Montana Constitution. Although this Court has decided this matter purely on State constitutional grounds, I also discuss how the Tax Credit Program violates the federal Establishment and Free Exercise Clauses.
The Tax Credit for Qualified Education Contributions is an indirect payment under Article X, Section 6(1), of the Montana Constitution.
¶ 47 Montana's definition of "appropriation" is "well-established and quite limited," referring only to the authority given to the Legislature to expend money from the state *616 treasury. Nicholson v. Cooney , 265 Mont. 406, 415, 877 P.2d 486, 491 (1994) (citations omitted). However, the plain language of Article X, Section 6(1), prohibits more than appropriations; as Justice Baker notes in her Dissent, it prohibits four actions, including indirect payments. In this case, the District Court ended its analysis prematurely by not considering whether the Tax Credit Program constitutes an "indirect payment."
¶ 48 As to whether the money comes from a public fund, when determining whether the Tax Credit for Qualified Education Contributions (TCQEC) of Title 15, chapter 30, part 31, creates a "direct or indirect appropriation or payment," it is necessary to understand that while the TCQEC deems the money provided to the SSO by a taxpayer to be a "donation," it is not in fact a donation. To donate is to give property or money without receiving consideration for the transfer. Donate , Black's Law Dictionary (10th ed. 2014). Here, the taxpayer "donates" nothing, because for every dollar the taxpayer diverts to the SSO, the taxpayer receives one dollar in consideration from the State in the form of a lower tax bill. The taxpayer simply chooses, with the State's blessing, to pay the money he or she otherwise owes to the State to an SSO. Since religious schools would be eligible to receive tuition payments from these funds, this runs afoul of the purpose of Article X, Section 6"to guard against the diversion of public resources to sectarian school purposes." Kaptein ex rel. Kaptein v. Conrad Sch. Dist. , 281 Mont. 152, 163-64, 931 P.2d 1311, 1318 (1997) (Nelson, J., specially concurring).
¶ 49 For the "donor," the difference between a dollar-for-dollar tax ***471 credit and a typical charitable tax deduction is remarkable. The former costs them absolutely nothing out of pocket. See Hibbs v. Winn , 542 U.S. 88, 95, 124 S.Ct. 2276, 2282, 159 L.Ed.2d 172 (2004) (deeming contributions to a similar Arizona program "costless" to the "donor"). The dollar-for-dollar diversion distinguishes this program from other tax credit programs, such as the contributions to university or college foundations and endowment funds codified in § 15-30-2326, MCA, which offers taxpayers a tax credit equal to 10% of the amount of qualifying charitable contributions made. In such instances, the State incentivizes charitable giving; for example, under § 15-30-2326, MCA, for every $10 a taxpayer contributes, that taxpayer's tax liability is decreased by $1. The taxpayer, however, still donates $9 out of his or her own pocket. Here, the taxpayer donates none of his or her own funds, but instead dictates where and how a portion of their tax liability is spent. Our first-and currently only-SSO acknowledges as much, urging taxpayers to make a donation "to direct a portion of your taxes to help a student thrive...."[1]
¶ 50 Justice Baker observes that under the TCQEC, "[n]o money originates, is deposited into, or is expended from the state treasury or any public fund." Dissent, ¶ 94. And since the money is never deposited into and then expended from a public fund, it is not an appropriation. Board of Regents v. Judge , 168 Mont. 433, 446-47, 543 P.2d 1323, 1330 (1975).[2] However, the only reason the money is not deposited into and then expended from a public fund is because the TCQEC diverts it before it reaches the public treasury. The Legislature recognized this diversion within SB410, the bill that created the TCQEC, when it set aside $3 million from the State's budget to cover the revenue shortfall ***472 the Tax *617 Credit Program created.[3] Justice Baker likewise acknowledges the TCQEC diverts funds, although she would deem this "an indirect transfer of benefit to the student-selected school" but not find this to be an indirect payment. Dissent, ¶ 93 (emphasis in original). A "transfer of benefit" is simply an oblique way of saying "assignment."[4] Allowing a taxpayer to assign a portion of his or her tax liability by paying the money owed to the State to a third party is not a "donation" by the taxpayer.
¶ 51 The TCQEC was explicitly designed as a tax expenditure.[5] Section 5-4-104(2), MCA, defines "tax expenditures" as "those revenue losses attributable to provisions of Montana tax laws that allow a special exclusion, exception, or deduction from gross income or that provide a special credit ... including: ... (d) credits allowed against Montana personal income tax or Montana corporate income tax." Indisputably, the Tax Credit Program creates a "tax expenditure" under § 5-4-104(2), MCA. See also DaimlerChrysler Corp. v. Cuno , 547 U.S. 332, 343-44, 126 S.Ct. 1854, 1862, 164 L.Ed.2d 589 (2006) (" '[T]ax expenditures' ... reduce amounts available to the treasury by granting tax credits or exemptions."). Moreover, many of the items enumerated under § 5-4-104(2), MCA, while not appropriations, are nonetheless expenditures.
¶ 52 Every tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become "indirect and vicarious 'donors.' " Texas Monthly, Inc. v. Bullock , 489 U.S. 1, 14, 109 S.Ct. 890, 899, 103 L.Ed.2d 1 (1989) (quoting Bob Jones Univ. v. United States , 461 U.S. 574, 591, 103 S.Ct. 2017, 2028, 76 L.Ed.2d 157 (1983) ). "Both tax exemptions and tax deductibility are a form of subsidy.... Deductible contributions are similar to cash grants of the amount of a portion of the individual's ***473 contributions." Regan v. Taxation with Representation , 461 U.S. 540, 544, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1983). Regan further held that, by denying a political lobbying organization tax-exempt status under § 501(c)(3), the U.S. Code was not denying the organization any independent benefit, but "Congress has merely refused to pay for the lobbying out of public moneys." Regan , 461 U.S. at 545, 103 S.Ct. at 2001. Texas Monthly , Bob Jones University , and Regan all recognize that deductions and exemptions function the same as an appropriation by allowing some taxpayers to pay lower taxes than they otherwise would. Although Justice Rice in his Dissent characterizes DOR's argument on this point as "an utter misstatement of the fundamental right of private property ownership," Dissent, ¶ 115, it is, in fact, consistent with the U.S. Supreme Court's holdings. Likewise, Article X, Section 6(1), of the Montana Constitution recognizes that a tax expenditure may not be an appropriation per se but nonetheless may function in the same manner. Thus, Article X, Section 6(1), prohibits not only appropriations, but also payments.
¶ 53 By creating a diversionary scheme whereby money otherwise bound for the public treasury is diverted, the Legislature has created an indirect payment. Moreover, as noted above, the TCQEC does require "funding," with the State setting aside $3 million to cover the anticipated revenue shortfall this statutory scheme is expected to cause in its first year-in addition to the substantial administrative costs described in the Majority Opinion.
*618 The funds generated by the Tax Credit for Qualified Education Contributions aid schools controlled in whole or in part by a church, sect, or denomination.
¶ 54 Under the Tax Credit Program, no funds are delivered to students, but are paid directly to the schools. Section 15-30-3104(1), MCA, provides that the SSO delivers the scholarship funds "directly to the qualified education provider...." Thus, while the scholarships aid the students in assisting them in covering the cost of tuition, they aid the schools in the form of direct monetary payments. The economic effect of these funds is that of aid given directly to the school. See Mueller v. Allen , 463 U.S. 388, 399, 103 S.Ct. 3062, 3069, 77 L.Ed.2d 721 (1983).
¶ 55 In addition to the Montana cases cited by the Majority, federal precedent compels the conclusion that these funds aid religious schools. In Comm. for Public Educ. & Religious Liberty v. Nyquist , 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the U.S. Supreme Court found unconstitutional a statutory scheme which provided a grant to low-income parents who paid private school tuition. The Supreme Court rejected the argument that these grants did not constitute aid to a ***474 religious school since they went to the parents, holding, "By reimbursing parents for a portion of their tuition bill, ... the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions." Nyquist , 413 U.S. at 783, 93 S.Ct. at 2971. The Nyquist majority rejected the dissenters' position that "government aid to individuals generally stands on an entirely different footing from direct aid to religious institutions." Nyquist , 413 U.S. at 801, 93 S.Ct. at 2978 (Burger, C.J., dissenting). Here, by relieving parents of a portion of their tuition bill by directly paying part of the students' tuition, the effect of the aid is to provide financial support to QEPs, including religious schools.
¶ 56 Later, in Zobrest v. Catalina Foothills Sch. Dist. , 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), the U.S. Supreme Court upheld a deaf student's right to the services of a sign-language interpreter funded by the local school district, and pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., even though he attended a Catholic high school. The Supreme Court reasoned that the funding of an individual's interpreter "creates no financial incentive for students to undertake sectarian education." Zobrest , 509 U.S. at 9-10, 113 S.Ct. at 2467 (quoting Witters v. Wash. Dep't of Servs. for Blind , 474 U.S. 481, 488, 106 S.Ct. 748, 752, 88 L.Ed.2d 846 (1986) ). In other words, the student would have received the services of a district-funded sign-language interpreter regardless of which school he attended, and providing the interpreter gave no aid to the religious school because it did not relieve it of any costs it otherwise would have borne to educate its students. The interpreter benefited the student and not the school. Zobrest , 509 U.S. at 12, 113 S.Ct. at 2469. Here, however, the tuition payments aid the recipient schools because these funds directly cover the costs of educating the school's students. They do not, as in Zobrest , provide a benefit only to the student and to which the student would have been entitled regardless of school attended.
¶ 57 Therefore, I agree with the majority that the Tax Credit Program unconstitutionally creates an indirect payment of public funds that aids religious schools.
The Tax Credit Program violates the U.S. Constitution's Establishment and Free Exercise Clauses by compelling taxpayers to support religious schools in order to avail themselves of the tax credit.
¶ 58 Section 15-30-3111(1), MCA, provides in part that "[t]he donor may not direct or designate contributions to a parent, legal guardian, or specific qualified education provider." Thus, a taxpayer who reduces his or her tax liability by up to $150 by sending those funds to the SSO
***475 has no control over which QEP receives the benefit of those funds. Those funds may go to pay the tuition of a student at a secular school or a religious school, but the taxpayer cannot choose which school-or which type of school-to support.
¶ 59 As explained above, I do not consider this diversion of funds to be a genuine "donation." Nonetheless, taxpayers may wish to take advantage of the proffered tax credit, *619 whether to support a school or schools providing instruction consistent with a particular religion, to support the secular school that is designated as a QEP, or because they believe their tax money is better spent supporting private schools in general. Nonetheless, a taxpayer who desires to donate to an SSO in exchange for a tax credit may find donating under the constraints of the TCQEC untenable as the SSO is free to use this money to aid a religious school which the taxpayer may prefer not to support financially.
¶ 60 As the Majority explains, "The Legislature attempted to sever the indirect payment by requiring taxpayer donors to donate to an SSO generally and prohibiting them from directing or designating contributions to specific parents, legal guardians, or QEPs." Opinion, ¶ 33. However, in their attempt, the Legislature ran afoul of the Establishment and Free Exercise Clauses by compelling taxpayers who seek the tax credit to relinquish the choice as to whether to support a religious school, and whether to support, or decline to support, a particular religion.
A. The Tax Credit Program violates the Establishment Clause because it prohibits the donating taxpayer from choosing whether the funds aid a religious school.
¶ 61 The Establishment Clause of the First Amendment, applied to the States through the Fourteenth Amendment, prevents a State from enacting laws that have the "purpose" or "effect" of advancing or inhibiting religion. Zelman v. Simmons-Harris , 536 U.S. 639, 648-49, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002) (citation omitted). In Agostini v. Felton , 521 U.S. 203, 222, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391 (1997), the U.S. Supreme Court acknowledged its recent cases had undermined the assumptions upon which some of its earlier Establishment Clause cases had rested. It then took the opportunity to reiterate the principles it uses to evaluate Establishment Clause challenges: "[W]e continue to ask whether the government acted with the purpose of advancing or inhibiting religion," and "we continue to explore whether the aid has the 'effect' of advancing or inhibiting religion." Agostini , 521 U.S. at 222-23, 117 S.Ct. at 2010. We apply those principles here.
¶ 62 In Nyquist , the U.S. Supreme Court concluded that a state-funded ***476 tuition reimbursement for nonpublic schools violated the Establishment Clause. The Supreme Court explained, "[I]f the grants are offered as an incentive ... the Establishment Clause is violated.... Whether the grant is labeled a reimbursement, a reward, or a subsidy, its substantive impact is still the same." Nyquist , 413 U.S. at 786-87, 93 S.Ct. at 2972. The Supreme Court further held that, whether a parent received a cash reimbursement for tuition or was allowed to reduce his or her tax bill, "in both instances the money involved represents a charge made upon the state for the purpose of religious education." Nyquist , 413 U.S. at 791, 93 S.Ct. at 2974-75 (citation and quotation omitted).
¶ 63 In Mueller , 463 U.S. at 390, 103 S.Ct. at 3064, the U.S. Supreme Court upheld a Minnesota tax scheme which allowed parents to deduct certain educational expenses from their state income tax. Some Minnesota taxpayers had challenged the law, arguing that it violated the Establishment Clause by providing financial assistance to religious schools. Mueller , 463 U.S. at 392, 103 S.Ct. at 3065. The Supreme Court, noting that in some instances it had struck down "arrangements resembling ... forms of assistance," while in other instances it upheld roughly similar arrangements, analyzed the constitutionality of Mueller by comparing its facts to Nyquist and the cases Nyquist relied upon to determine if the Minnesota statute violated the Establishment Clause. Mueller , 463 U.S. at 393, 103 S.Ct. at 3066. First, the Supreme Court concluded that a State's decision to defray the educational expenses parents bear is a secular and understandable purpose, regardless of the nature of the school attended. Mueller , 463 U.S. at 395, 103 S.Ct. at 3067. The Mueller court found the universality of the tax deduction to be of considerable importance in upholding the Minnesota tax scheme. It held: In this respect, as well as others, this case is vitally different from the scheme struck down in Nyquist . There, public assistance amounting to tuition grants was *620 provided only to parents of children in nonpublic schools. Mueller , 463 U.S. at 397-98, 103 S.Ct. at 3068 (emphasis in original). Because the Minnesota tax scheme was available to the parents of all students in any school, public or private, the Supreme Court found it distinguishable from Nyquist , and thus constitutional. Mueller , 463 U.S. at 398-99, 103 S.Ct. at 3069 (concluding that the applicability of Nyquist's tax deduction only to the students of nonpublic schools "had considerable bearing" on court's decision to strike it down). Here, the scholarships regulated by the TCQEC bear the purpose of defraying the cost of tuition. However, this aid is available only for the parents of students attending certain non-public schools-unlike in Mueller , where parents could claim the ***477 tax deduction regardless of whether their children attended public or private schools. Mueller , 463 U.S. at 397, 103 S.Ct. at 3068. The present case is more akin to Nyquist than Mueller in this regard.
¶ 64 In Zelman , the U.S. Supreme Court considered whether an Ohio program that provided tuition aid to families violated the Establishment Clause. In so doing, the Supreme Court found that its Establishment Clause jurisprudence drew "a consistent distinction between government programs that provide aid directly to religious schools and programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." Zelman , 536 U.S. at 649, 122 S.Ct. at 2465 (citations omitted). Most pertinent to the present case, the Supreme Court explained that the amount of government aid channeled to religious institutions by aid recipients is irrelevant to the constitutionality of the scheme. The salient point is "whether recipients generally were empowered to direct the aid to schools or institutions of their own choosing." Zelman , 536 U.S. at 651, 122 S.Ct. at 2466-67. Relying on Mueller , Witters , and Zobrest , Zelman held: "[W]here a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause." Zelman , 536 U.S. at 652, 122 S.Ct. at 2467.
¶ 65 Here, the recipients of the "government aid" are not the parents and students; they are the taxpayers who donate to the SSO and in exchange obtain tax credits. Under §§ 15-30-3104(1), and -3111(1), MCA, these taxpayers get no choice; they are at the mercy of the SSO as to where their donations are spent. Thus, it cannot be said the donations are given "to religious schools wholly as a result of their own genuine and individual private choice."
¶ 66 In Ariz. Christian Sch. Tuition Org. v. Winn , 563 U.S. 125, 142-43, 131 S.Ct. 1436, 1447, 179 L.Ed.2d 523 (2011), the U.S. Supreme Court concluded that Arizona taxpayers, as mere taxpayers, lacked standing to challenge a tax credit/tuition scheme roughly similar to the TCQEC. In that instance, the scholarship organization, similar to our SSO, was called a "school tuition organization," or STO. Winn , 563 U.S. at 129, 131 S.Ct. at 1440. There, the Supreme Court held that taxpayers had no standing to challenge the scheme because they were free to choose not to donate to an STO, and because they had no right to dictate how other citizens spent, or chose not to spend, their own pre-tax money. Winn , 563 U.S. at 142, 131 S.Ct. at 1447. The Supreme Court ***478 explained that all Arizona taxpayers "remain free to pay their own tax bills, without contributing to an STO," or may "contribute to an STO of their choice, either religious or secular." Winn , 563 U.S. at 142, 131 S.Ct. at 1447. Here, Montana taxpayers who wish to take advantage of the Tax Credit Program have no such choice, as § 15-30-3111(1), MCA, mandates that the donor cannot choose which school receives their contribution. Thus, since only one SSO exists in Montana, and its QEPs consist of both religious and secular schools, the contributor cannot choose whether or not to support a religious school and still avail himself or herself of the tax credit.
¶ 67 Plaintiffs have litigated this matter in their role as parents of children attending Stillwater Christian School and not as taxpayers seeking a tax credit. The Tax Credit *621 Program does not inhibit Plaintiffs' choice as to whether their children attend a religious school, but it does inhibit the taxpayers' right to exercise their own "genuine and individual private choice[s]" as to whether their donations fund a secular or religious education. On these grounds, I would hold the Tax Credit Program violates the Establishment Clause.
B. The Tax Credit Program violates the Free Exercise Clause because it compels taxpayers to acquiesce in the use of their donations to support religious schools in order to claim a tax credit.
¶ 68 In Mitchell v. Helms , 530 U.S. 793, 828, 120 S.Ct. 2530, 2551, 147 L.Ed.2d 660 (2000), the U.S. Supreme Court commented that it had, in numerous decisions, "prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity." (Citations omitted.) Here, however, the TCQEC discriminates in its distribution of a tax credit for donations to SSOs because donors have no choice but to permit the SSO to designate a donation to a student attending a religious school.
¶ 69 In Trinity Lutheran , the U.S. Supreme Court found that a policy of the Department of Natural Resources of the State of Missouri, which barred religious institutions from participating in a playground resurfacing program, "expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." Trinity Lutheran Church of Columbia, Inc. v. Comer , --- U.S. ----, 137 S.Ct. 2012, 2021, 198 L.Ed.2d 551 (2017). Here, contributors who wish to claim an otherwise available tax credit for donating to an SSO cannot do so without being compelled to support a religious school. In Trinity Lutheran , the Supreme Court stated, "[T]he Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain ***479 a religious institution." Here, § 15-30-3111(1), MCA, puts the taxpayer to a choice: He or she may participate in the Tax Credit Program, but only if he or she agrees to relinquish control of where that donation is spent, with the likely result that the SSO will give those funds to a religious school.[6]
¶ 70 The Free Exercise Clause protects religious observers from unequal treatment. Church of Lukumi Babalu Aye v. City of Hialeah , 508 U.S. 520, 542, 113 S.Ct. 2217, 2232, 124 L.Ed.2d 472 (1993) (citation omitted). Denying a generally available benefit solely due to religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest "of the highest order." Trinity Lutheran , --- U.S. ----, 137 S.Ct. at 2019 (citations omitted). Here, the Tax Credit Program would deny this benefit to taxpayers who wish to avail themselves of a tax credit for private-school scholarships but prefer not to support religious schools, or may prefer to support only a specific religion's schools.
¶ 71 The U.S. Supreme Court has held that the exclusion of degrees in devotional theology from eligibility in a state scholarship program did not violate the Free Exercise Clause because the exclusion "does not require students to choose between their religious beliefs and receiving a government benefit." Locke , 540 U.S. at 720-21, 124 S.Ct. at 1312. Here, however, taxpayers wishing to donate to a QEP and claim a tax credit for that donation are forced to choose between their religious beliefs and a government benefit because they cannot control whether the donation is used to fund a religious education.
¶ 72 Notwithstanding the additional analysis I offer here, I concur with and join in this Court's Opinion.
Chief Justice Mike McGrath and Justice Dirk Sandefur join in the concurring Opinion of Justice Gustafson.